UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,                :

              - v -                :                09 Cr. 722 (MGC)

PAUL GREENWOOD,                :
STEPHEN WALSH,
                                                   :

                     Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

COMMODITY FUTURES TRADING                :
COMMISSION,
                                                   :

              - v -                :                09 Civ. 1749 (GBD)

                                                   :
STEPHEN WALSH, ET AL.,
                                                   :

                     Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

SECURITIES AND EXCHANGE                :
COMMISSION,
                                                   :

              - v -                :                09 Civ. 1750 (GBD)

                                                   :
WG TRADING INVESTORS, L.P., ET AL.,
                                                   :

                     Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


## **PRE-HEARING MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA**

                            PREET BHARARA
                            United States Attorney for the
                            Southern District of New York

John J. O'Donnell
Marissa Molé
Assistant United States Attorneys
   *Of Counsel*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    The Indictment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.    Walsh's Motion And The Government's Response . . . . . . . . . . . . . . . . . . . 3

    C.    The Court's March 9, 2010 Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    D.    The Anticipated Sale Of The Half Moon Lane Home . . . . . . . . . . . . . . . . . 6

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

I.    The Scope Of The Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

II.    The Anticipated Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    A.    Probable Cause That Walsh Has Committed A Fraud . . . . . . . . . . . . . . . . . 14

    B.    Probable Cause That Walsh's Interest In
        The Half Moon Lane Home Is Traceable To The Fraud . . . . . . . . . . . . . . . . 17

III.    *Monsanto* Precludes Exposure Of Government Witnesses At The Hearing . . . . . . . . 18

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

i

## TABLE OF AUTHORITIES

**Cases**

CFTC v. Walsh, 618 F.3d 218 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 17

FDIC v. Malin, 802 F.2d 12 (2d Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Marine Midland Bank, N.A. v. United States, 11 F.3d 1119 (2d Cir.1993) . . . . . . . . . . . . . . . . 9

Mathews v. Eldridge, 424 U.S. 319 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Oyekoya v. United States, 175 F. Supp. 2d 522 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . 10

SEC v. Coates, No. 94 Civ. 5361 (KMW),
    1994 WL 455558 (S.D.N.Y. Aug. 23, 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

SEC v. FTC Capital Markets, Inc., No. 09 Civ. 4755 (PGG),
    2010 WL 2652405 (S.D.N.Y. June 30, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

In re the Seizure of All Funds in Accounts in the Names Registry Publishing,
    68 F.3d 577 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

United States v. 4492 South Livonia Rd., 889 F.2d 1258 (2d Cir.1989) . . . . . . . . . . . . . . . . . 9

United States v. Ceballos, 812 F.2d 42 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

United States v. Daccarett, 6 F.3d 37 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

United States v. E-Gold, Ltd., 521 F.3d 411 (D.D.C. 2008) . . . . . . . . . . . . . . . . . . . . . . 18, 19

United States v. Holder, 990 F.2d 1327 (D.C.Cir.1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

United States v. Jones, 160 F.3d 641 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

United States v. Monsanto, 924 F.2d 1186 (2d Cir. 1991)(en banc) . . . . . . . . . . . . . . . . . *passim*

United States v. Simpson, No. 09 Cr. 249,
    2011 WL 195676 (N.D. Tx. January 20, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**Statutes and Rules**

7 U.S.C. § 6o(1)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

7 U.S.C. § 13(a)(2)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

15 U.S.C. § 78j(b)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

18 U.S.C. § 371  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 1343  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 1957  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

17 C.F.R. § 240.10b-5  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum as an aid to the Court in connection with the *Monsanto* hearing scheduled for March 28-30, 2011.  We write to set forth the background to the hearing, the applicable legal standards, and the evidence that we intend to offer at the hearing.  In addition, the Government moves to quash the defense's subpoenas to certain of the Government's cooperating witnesses, and to the Receiver, and requests that the Court convene a conference in advance of the *Monsanto* hearing to address the proper scope of the hearing.

The sole issue at the *Monsanto* hearing is whether defendant Stephen Walsh ("Walsh") may use the proceeds of the sale of his residence at 7 Half Moon Lane, Sands Point, New York ("Half Moon Lane Home") to pay his attorneys' fees.  This Court (Cedarbaum and Daniels, D.JJ.), previously held that Walsh could use $900,000 of the proceeds of the sale of the Half Moon Lane Home to pay his attorneys' fees, unless the Government established at a *Monsanto* hearing (a) probable cause to believe that Walsh had committed the fraud charged in the indictment; and (b) that the Half Moon Lane Home is properly restrained because his interest in the house is traceable to Walsh's fraud.  Because the Court limited Walsh's recovery to a fixed amount ($900,000), the Government chose not to pursue the hearing.

Since that time, several significant things have transpired.  First, the Receiver appointed by Judge Daniels to oversee the assets of WG Trading Company LP ("WG Trading Company"),  and its related entities (which Walsh used as vehicles to perpetrate his fraud), and Walsh's personal assets, has reached an agreement to sell the Half Moon Lane Home for $4 million in cash.  This transaction is expected to close in or about April 2011.  Second, Walsh,

1

through his counsel, has indicated that he intends to apply to the Court for relief from the

$900,000 limitation.  In other words, Walsh seeks to have access to the remaining portion of the

sale proceeds to pay his attorneys' fees.  Third, Walsh's long-time business partner, and

co-conspirator, Paul Greenwood ("Greenwood") has entered a guilty plea to all of counts of the

Indictment pursuant to a cooperation agreement with the Government, a circumstance that

manifestly strengthens the Government's case against Walsh.  Given all of those circumstances,

the Government has chosen to exercise its right to establish at a *Monsanto* hearing that Walsh is

not entitled to the proceeds of the sale of the Half Moon Lane Home.  Rather, those proceeds

should be held by the Receiver and should remain available to compensate the defrauded

investors upon Walsh's conviction.[1]

## BACKGROUND

A.      **The Indictment**

On February 25, 2009, Walsh and Greenwood were arrested and charged with

securities fraud, wire fraud, and conspiracy, based upon a criminal complaint.  On July 24, 2009,

a Grand Jury in this district returned Indictment 09 Cr. 722 (MGC), which charged Greenwood

and Walsh in six counts with the following:  (1) conspiracy to commit securities fraud and wire

fraud, in violation of 18 U.S.C. § 371; (2) securities fraud, in violation of 15 U.S.C. §§ 78j(b)

---

[1]      The Government recognizes that it is bound by its previous agreement to forgo litigating Walsh's entitlement to the $900,000, which, as noted above, was based on litigation considerations.  That agreement, therefore, was not a concession that Walsh's interest in the home was untainted.  Further, we note that on or about November 15, 2010, the Court allowed Walsh to obtain (1) $100,298 from Walsh's 2009 tax refund, and (2) $112,500 from an unused retainer fee paid to his prior attorneys, as an advance against the $900,000 he is entitled to receive from the proceeds from the sale of the house.

and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2; (3) commodities fraud, in violation of 7

U.S.C. §§ 6o(1) and 13(a)(2), and 18 U.S.C. § 2; (4) and (5) two counts of wire fraud, in

violation of 18 U.S.C. §§ 1343 and 2; and (6) money laundering, in violation of 18 U.S.C. §§

1957 and 2.

      The Indictment charges that from 1996 through February 2009, Greenwood and

Walsh, through WG Trading and its affiliated entities, orchestrated a scheme to defraud investors

out of hundreds of millions of dollars.  In furtherance of their fraudulent scheme, Greenwood and

Walsh solicited funds under false pretenses, failed to invest investors' funds as promised, and

misappropriated and converted investors' funds to their own personal benefit without the

knowledge or authorization of the investors.[2]

## B.    Walsh's Motion And The Government's Response

      Walsh filed his motion to unfreeze assets on December 22, 2009.  In the motion,

Walsh argued that the Half Moon Lane Home should not be subject to the asset freeze imposed

in the SEC Action and the CFTC Action based upon Walsh's claim that he did not use fraud

proceeds when he initially purchased the home.  Specifically, Walsh asserted that in 1983, he and

his then-wife Janet (now Janet Schaberg ("Schaberg")) purchased a home at 38 Arden Lane,

Sands Point, New York, and some adjacent land ("Arden Lane Home"), for approximately

_____

[2]     On February 25, 2009, the SEC and the CFTC each instituted a civil enforcement
action against Walsh, Greenwood, and other defendants and relief defendants, both of which
actions are pending before the Honorable George B. Daniels.  (CFTC v. Walsh, et al., 09 Civ.
1749 (GBD)("CFTC Action"); SEC v. WG Trading Company LP, et al., 09 Civ. 1750
(GBD)("SEC Action")).  Pursuant to the showings made by the SEC and the CFTC, Judge
Daniels has entered preliminary injunctions, frozen assets belonging to the defendants and their
entities, and has appointed a Receiver (the "Receiver") to oversee the assets and affairs of the
defendants and relevant entities.

$900,000. (Declaration of Stephen Walsh, dated December 21, 2009 ("Walsh Dec.") ¶ 4).

Walsh and his then-wife renovated the house and lived in it for approximately 16 years. In 1999,

Walsh and his ex-wife sold the Arden Lane Home for approximately $4.5 million. (Walsh Dec.

¶ 6). Walsh asserts that in a separate transaction the same day, he used $3.15 million of the sale

proceeds to purchase the Half Moon Lane Home for cash.

      The Government responded to Walsh's motions on a number of grounds. Most

relevant, the Government argued that the Half Moon Lane Home was tainted in at least two

important respects. First, a review of the bank records of WG Trading Investors LP ("WG

Investors") (an entity that Walsh and Greenwood used to commit their fraud) for 2004 through

2009, indicated that Walsh had used stolen investor funds in the approximate amount of at least

$1.1 million to pay various expenses for the upkeep of the house. (Declaration of Brick Kane,

dated January 14, 2010 ("Kane Dec.") at ¶ 10 and Ex. F).

      Second, Walsh used millions of dollars of investor funds to acquire ownership of

the Half Moon Lane Home as part of his divorce agreement in or about 2006. Prior to their

divorce, title to the Half Moon Lane Home was in Schaberg's name. As part of their separation

and divorce agreement dated as of November 1, 2006 ("Separation Agreement"), full title and

interest in the residence was transferred to Walsh. (Walsh Dec. ¶ 8; Separation Agreement ¶ 4.5

(Kane Dec. Ex. G)). However, the evidence indicates that Walsh caused at least $3.1 million

dollars to be transferred directly from the WG Investors account to Schaberg pursuant to that

Separation Agreement in which he obtained full ownership of the house. (Kane Dec. ¶ 12).

      Moreover, the evidence establishes that Walsh used another $3 million in investor

funds to purchase an apartment for his ex-wife as part of the same Separation Agreement.

Pursuant to the Separation Agreement, Janet Schaberg was given full title, right, and interest in

an apartment located at 860 United Nations Plaza, New York, NY.   (Separation Agreement ¶

4.7 (Kane Dec., Ex. G)).  On or about February 8, 2005, Walsh caused $3 million to be

transferred from the WG Investors account to Schaberg's account at Merrill Lynch.  Shortly

thereafter, Schaberg purchased the apartment at U.N Plaza for approximately $4 million.  At her

deposition, Walsh's ex-wife testified that she received approximately $3 million from Walsh

towards the purchase of the apartment.  (Testimony of Janet Schaberg, at pages 26, 29-30 (June

9, 2009)).

Thus, irrespective of whatever Walsh did to purchase the house in 1999, he used

millions of dollars of investor funds from 2005 to 2009 to acquire an undivided interest in the

Half Moon Lane Home.  The Government contends that the recent use of investor funds to

acquire full ownership of the house proves that Walsh's interest in the house is traceable to the

fraud.

**C.      The Court's March 9, 2010 Order**

On March 9, 2010, the Court issued an order in the criminal and civil cases,

signed by Judges Cedarbaum and Daniels, in which the Court determined that the defendant is

"entitled to pay for the lawyers of his choice using untainted funds."  (March 9, 2010 Order at 7).

The Court ordered that a probable cause hearing shall be held for the Government to demonstrate

what extent, if any, the assets sought to be unfrozen are tainted by the use of fraud proceeds to

acquire or maintain the assets.  (March 9, 2010 Order, at 7-8, ).  In making this determination, the

Court expressly relied upon *United States* v. *Monsanto*, 924 F.2d 1186 (2d Cir. 1991)(en banc),

where the Court of Appeals held in a criminal forfeiture case that a probable cause hearing is

required where the Government seeks to restrain assets that are needed for the defendant to retain counsel of his choice. 924 F.2d at 1203. Notably, the Court did not find that the residence was "untainted." Rather, the Court ordered that a hearing be held on the issue.

The Court determined that the funds at issue would be limited to $900,000 from the sale of Walsh's Half Moon Lane Home; the $900,000 was based on the purchase price of a home that Walsh bought in 1983, the sale proceeds of which Walsh allegedly used to acquire his current residence in 1999, notably after the fraud had begun. The Court also directed that the Receiver immediately begin the process of liquidating the assets in question so that the limited portion of the proceeds as specified could be used for the defense.

The Government, after careful review, decided that because of the limitation imposed in the Court's order, it would not pursue a hearing at that time. Accordingly, the Government stated in its April 9, 2010 response to Walsh's motion for reconsideration: "In light of the Court's ruling on the limitation of the amounts that can be recovered after a hearing, the Government does not intend to seek to retain an asset freeze over the . . . $900,000 value of Walsh's predecessor home, once those assets are sold. Consequently, there is no need for a hearing [on the $900,000]."

D.     **The Anticipated Sale of the Half Moon Lane Home**

On or about January 28, 2011, the Receiver requested that Judge Daniels enter an order authorizing the Receiver to sell the Half Moon Lane Home for $4 million. In its letter, the Receiver indicated that based upon two appraisals that the Receiver has obtained, $4 million represents the fair market value of the property. Further, the Receiver's letter indicates that the Receiver will pay the closing costs, including the broker's commission, and that the receivership

6

estate will be reimbursed from the remaining proceeds for the expenses incurred in repairing the property. The Receiver expects that transaction to close in or about April 2011.[3] Judge Daniels "so ordered" the letter on January 31, 2011, and has directed the Receiver to hold the proceeds of the sale of the house pending further order of the Court.

Once that sale is final, Walsh will receive the $900,000 released to him pursuant to the March 9, 2010 order (subject to the set-offs identified above). However, his attorneys have previously indicated that they have already charged fees and expenses in excess of that amount, much of which counsel attributes to litigating the issues relating to their own compensation. (*See* Oct. 25, 2010 Tr. at 39; Letter from Mark Flessner dated June 9, 2010, at 2).

## DISCUSSION

### I.    The Scope Of The Hearing

In *United States* v. *Monsanto*, 924 F.2d 1186,  the Second Circuit concluded that, in a case involving a criminal asset freeze, "the fifth and sixth amendments, considered in combination, require an adversary, post-restraint, pretrial hearing as to probable cause that (a) the defendant committed crimes that provide a basis for forfeiture, and (b) the properties specified as forfeitable in the indictment are properly forfeitable, to continue a restraint of assets (i) needed to retain counsel of choice and (ii) ordered ex parte." 924 F.2d at 1203.  In *SEC* v. *Coates*, No. 94 Civ. 5361, 1994 WL 455558, at *1 (S.D.N.Y. Aug. 23, 1994), the court, applying *Monsanto*, concluded that an asset freeze imposed in a securities fraud case could not be continued without,

---

[3]    As indicated in the Receiver's January 28, 2011 letter, Janet Schaberg has asserted a lien against the property based upon a $25,000 mortgage that was created pursuant to the November 1, 2006 Separation Agreement between Janet and Stephen Walsh. We understand that Schaberg may pursue other claims against Walsh based upon his obligations under the Separation Agreement.

*inter alia*, "a showing that the frozen assets are traceable to fraud." 1994 WL 455558, at *3

(emphasis added). This Court adopted the court's reasoning in *Coates* in ordering the instant

*Monsanto* hearing. (March 9, 2010 Order, at 6-7).

We have found very little guidance concerning the scope and conduct of a

*Monsanto* hearing. Courts in this district have stated that in order to sustain an asset restraint in a

civil enforcement action in cases such as this one, the Government must establish that there is

probable cause to believe that the home is "traceable to the fraud." *SEC* v. *FTC Capital*

*Markets, Inc.*, No. 09 Civ. 4755 (PGG), 2010 WL 2652405 (S.D.N.Y. June 30, 2010) (where

defendant in a criminal case has demonstrated that without advancement of the frozen funds, she

will be unable to pay defense counsel's fees in the criminal action, the SEC is required to

demonstrate that the frozen funds are traceable to fraud); *Coates*, 1994 WL 455558, at *3

(requiring SEC to make "a showing that the frozen assets are traceable to fraud"). The Second

Circuit has made clear that the only issue to be considered at the *Monsanto* hearing is probable

cause. As the court recognized, "[i]f the government succeeds in establishing probable cause, the

policies favoring forfeiture, preclude any constitutional requirement that equities be further

weighed or balanced on the issue of making funds available to retain counsel." *Monsanto*, 924

F.2d at 1196 (citations omitted).

In the context of forfeiture cases, the Second Circuit has described the probable

cause burden as follows:

> [p]robable cause is established if the government can show that it has reasonable
> grounds, more than mere suspicion, to believe that the property is subject to
> forfeiture. The government must be able to show a nexus between the illegal
> conduct and the seized property. The government is not required to link a bank
> account to a particular illegal transaction, but it must have probable cause to

connect the account to criminal activity.

*In re the Seizure of All Funds in Accounts in the Names Registry Publishing*, 68 F.3d 577, 580 (2d Cir. 1995) (*quoting Marine Midland Bank, N.A.* v. *United States*, 11 F.3d 1119, 1126 (2d Cir.1993)).

Further, whether probable cause exists must be determined on the basis of the totality of the circumstances. *United States* v. *Ceballos*, 812 F.2d 42, 50 (2d Cir. 1987). In the context of civil forfeiture proceedings, these circumstances are not limited to evidence presented to the magistrate who issued the warrant. *United States* v. *4492 South Livonia Rd.*, 889 F.2d 1258, 1268 (2d Cir.1989) ("Once a forfeiture proceeding is brought, if further evidence is legally obtained to justify [a finding of probable cause], there is no persuasive reason to bar its use."). The findings supporting a district court's determination as to probable cause are reviewed for clear error, but the determination itself is a conclusion of law reviewed *de novo*. *Accounts in the Names Registry Publishing*, 68 F.3d at 580 (citing *United States* v. *Holder*, 990 F.2d 1327, 1328 (D.C.Cir.1993)).

We recognize that the Second Circuit has determined that the fact of an indictment, by itself, does not establish the existence of probable cause to believe that the defendant has committed the charged offenses, and that the Government bears the burden of establishing such probable cause at the hearing. *Monsanto*, 924 F.2d at 1196-97. However, the Second Circuit was cognizant of the risks that a defendant may seek to use the hearing that it was requiring as a "mini-trial" on the merits of the case, and the burden that such a procedure would place on the Government. Thus, the court stated that "the Federal Rules of Evidence would not be followed in the pretrial hearings that this opinion would require, thus allowing the use of

9

hearsay testimony and precluding unwarranted exposure of Government witnesses." *Id.* at 1198,

1203; *see also United States* v. *Daccarett*, 6 F.3d 37, 56 (2d Cir. 1991) (in a forfeiture context,

"[a] finding of probable cause may be based on hearsay, even hearsay from confidential

informants, or circumstantial evidence, particularly in cases involving bank accounts, money, or

other fungible assets")(citations omitted); *Oyekoya* v. *United States*, 175 F. Supp. 2d 522, 525

(S.D.N.Y. 2001) (a finding of probable cause may be based on hearsay and circumstantial

evidence).

## II.     The Anticipated Evidence

As contemplated by *Monsanto*, the Government intends to call Special Agent

Barnacle to testify at the hearing.  Agent Barnacle will testify about his investigation, including

facts he has learned from interviews with witnesses, including cooperating witnesses Greenwood,

Deborah Duffy ("Duffy"), and Mark Bloom ("Bloom").  In addition, the Government will rely

upon materials filed by the CFTC and the SEC in their civil enforcement actions, and reports and

analysis prepared by the Receiver based upon the Receiver's review of the books and records of

WG Trading and related entities.[4]  We expect that the evidence will show, in substance, the

following facts.

### A.     Probable Cause To Believe That Walsh Has Committed A Fraud

Greenwood and Walsh were the principals of a WG Trading Company, which was

a broker-dealer registered with the SEC and a commodity pool operator registered with the

---

[4]     The Receiver has publicly filed two detailed reports setting forth his findings and conclusions based upon his review if the books and records of WG Trading and its affiliates.  See Receiver's Interim Report dated May 27, 2009 (CFTC Action Dkt. No. 110; SEC Action Dkt. No. 102), and Receiver's Interim Report dated June 3, 2010 (CFTC Action Dkt. No. 329; SEC Action Dkt. No. 303).

CFTC. In addition, they controlled other affiliated entities that were not registered, with the most prominent of these being WG Trading Investors.

In or about 1990, Greenwood and Walsh solicited funds from investors, which they promised to invest pursuant to some specified strategies. In the early 1990s, Greenwood and Walsh narrowed their approach down to one strategy known as "equity index arbitrage," which involved buying and simultaneously selling, through futures, the stocks of a well-known equity index (such as the Standard and Poors 500 Index (the "S&P 500 Index")). Thus, during the time period covered by the indictment, Greenwood and Walsh, and others acting on their behalf, told investors both orally and in writing, that investor funds would be invested only pursuant to the "equity index arbitrage" strategy, which was represented to be a low risk strategy that had consistently outperformed the results of the S&P 500 Index for a period of more than 10 years. The Receiver has calculated that from approximately 1996 to 2009, WG Trading and WG Investors received more than $7.6 billion in contributions from investors, who were primarily institutional investors, such as charitable and university foundations, pension and retirement plans, and other institutions.

Investors were offered the opportunity to invest in WG Trading through different mechanisms. First, an investor could purchase a limited partnership interest in WG Trading. Second, an investor could invest through WG Investors by delivering funds to WG Investors in exchange for a promissory note from WG Investors to the investor, which would pay interest at a rate similar to the rate of return realized by a limited partnership interest in WG Trading. The investors were told that WG Investors was itself a limited partner of WG Trading, and that the majority of their funds would be passed through to WG Trading for investment pursuant to the

11

equity index arbitrage strategy.  Third, an investor could purchase an interest in an offshore fund,

which in turn would invest the investor funds through WG Investors in exchange for a

promissory note issued by WG Investors to the offshore fund.

Contrary to the representations that the funds would be invested pursuant to the

safe, low-risk trading strategy, however, Greenwood and Walsh misappropriated the investors'

funds to finance their own lavish personal lifestyles, meet periodic redemption requests of

investors, make payments in connection with an investment in a publicly traded company that

went bankrupt, and make payments for other unauthorized investments and loans by WG Trading

and WG Investors.

We expect that the evidence will show that Greenwood and Walsh diverted

investor funds to the following unauthorized investments, among others:

- In or about 1992, Greenwood and Walsh caused WG Trading to transfer $2.6 million of investor funds toward an investment in a group that obtained control of the New York Islanders Hockey Team ("Islanders"), which investment was initiated by Walsh.  After Walsh was unable to raise sufficient funds to complete his investment, Walsh and Greenwood took the money from the WG Trading account without disclosing to the investors that they were doing so.  This investment occurred in or about 1992, which was prior to the fraud period charged in the Indictment.

- In or about 1990, Greenwood and Walsh obtained a controlling interest in Signal Apparel, Inc. ("Signal"), a publicly traded Indiana corporation that sold licensed apparel.  The independent auditor's report dated March 26, 1997, for Signal's 1996 consolidated financial statements included an explanatory paragraph expressing substantial doubt about Signal's ability to continue as a going concern.  Signal's 1996 Annual Report disclosed Signal's liquidity problems and its dependence on financial support from Greenwood and Walsh.  Based upon his review of the books and records of WG Trading and its affiliates, the Receiver has calculated that WG Trading, WG Investors, and a related entity, paid over $198 million in connection with the Signal investment, which included, among other things,  non-open market financing and investing prior to 1997, purchasing

12

Treasury bills and cash deposits to guarantee Signal's bank loans, payments directly to Signal's lenders, cash advances to Signal, and payments of Signal's investments. The use of investor funds to provide capital to Signal was neither disclosed to nor authorized by their investors.

- In or about 2004, Walsh and an acquaintance started a hedge fund called Orion Constellation Partners L.L.P. ("OCP"), which had as its investment Orion Capital Management L.L.P. ("OCM"). Walsh, through his personal investment vehicle, controlled fifty percent of OCM and another entity that controlled OCP. Between January 3, 2006 and July 7, 2007, WG Investors, through an entity controlled by Greenwood and Walsh known as K&L Investments ("K&L"), contributed $180 million to OCP. During 2008 through the first five weeks of 2009, OCP distributed $167.9 million to K&L through WG Investors. As of May 2009, K&L's had an account at OCP valued at approximately $23 million. We expect that the evidence will show that Greenwood and Walsh decided to invest the investor funds in OCP, and created K&L as a vehicle to do so. The investment in OCP was neither disclosed to nor authorized by investors.

- In addition, Greenwood and Walsh used investor funds to make investments in various real estate limited partnerships. These investments were neither disclosed to nor authorized by the investors.

The evidence will further demonstrate that from at least on or about January 1, 1999, through on or about February 6, 2009, Greenwood caused WG Investors to divert approximately $80 million for his personal benefit, either directly to Greenwood or to others on his behalf. These transfers enabled Greenwood to, among other things, finance a massive construction project at his home in North Salem, New York, purchase and operate a horse farm, and purchase expensive antique collectible items.

Similarly, from at least on or about January 1, 1999, through on or about January 9, 2009, Walsh caused WG Investors to divert approximately $51 million to or for the benefit of Walsh personally. Walsh used these funds for his own lifestyle, and also to make payments to Schaberg that he was required to pay under the terms of their Separation Agreement.

13

In order to conceal their fraud, Greenwood and Walsh, and their co-conspirators, created and caused others to create false account statements that were sent to clients to reflect fictitious returns consistent with the returns that had been promised to those clients.  In addition, Greenwood and Walsh used WG Investors – which was neither regulated nor audited – as the vehicle for making unauthorized investments and misappropriating funds.  Thus, the worthless Signal investment was carried on the books of WG Investors, as were the investments in the Orion hedge fund and the real estate partnerships.  In order to cover up the fact that WG Investment had a huge black hole of missing funds, Greenwood and Walsh issued promissory notes to WG Investors, which were carried as assets on the books of WG Investors.  From in or about 1998 through in or about 2008, Greenwood issued promissory notes to WG Investors totaling approximately $293 million ("Greenwood Notes");  From in or about 1998 through in or about 2008, Walsh issued promissory notes totaling approximately $261 million ("Walsh Notes").  The notes included amounts representing: (a) the funds that were transferred to or for the benefit of Greenwood and Walsh, respectively; (b) the capitalization of purported investor earnings paid to or accrued for investors who held notes issued by WG Investors, which earnings were fictitious and fraudulent; and (c) write-offs in unprofitable and unauthorized investments that Greenwood and Walsh had made through WG Trading and WG Investors.

**B.     Probable Cause That Walsh's Interest In
The Half Moon Lane Residence Is Traceable To The Fraud**

As referenced above, the Government intends to establish that Walsh's interest in the Half Moon Lane Home is traceable to the fraud because:  (1) Walsh directed that $6.1 million in funds be transferred to directly out of the WG Trading Investors bank account to his ex-wife as

part of the divorce settlement in which Walsh obtained full ownership of that house, and (2) Walsh used investor funds to pay $1.1 million in expenses and improvements related to the house. Thus, Walsh spent at least $7.2 million in tainted investor funds – during the course of the charged fraud – in order to obtain full ownership and maintain and improve the Half Moon Lane property. These amounts are notably far in excess of the expected proceeds from the sale of the house of $4 million.

The evidence concerning Walsh's acquisition of an undivided interest in the Half Moon Lane Home cannot be subject to any serious factual dispute. After the purchase of the home and prior to the divorce, the Half Moon Lane Home was held in the name of Janet Walsh, now Janet Schaberg. Pursuant to their November 1, 2006, Separation Agreement, Schaberg conveyed her ownership interest in the home to Walsh, while she retained sole ownership of condominiums in New York City and in Florida. The Separation Agreement also provided that Schaberg retained, and Walsh waived all claim to, nearly $5 million held in several checking accounts, and that Walsh agreed to pay Janet a total of $12.5 million pursuant to an installment payment plan. In executing the Settlement Agreement, both parties waived their rights to any distributive award or equitable distribution with respect to property acquired by the other either before or during the marriage. *See generally CFTC v. Walsh*, 618 F.3d 218, 222 (2d Cir. 2010)(describing terms of the agreement).[5]

---

[5]     The CFTC and the SEC each named Schaberg as a relief defendant in their civil enforcement actions in order to compel her to disgorge the fraud proceeds that she received. Schaberg sought to have the district court's order freezing her assets vacated, arguing that she received the assets as a good faith purchaser for value. Finding that the case involved novel questions of New York state law, the Second Circuit certified the following questions to the New York State Court of Appeals: (1) Does "marital property" within the meaning of the N.Y. Domestic Relations Law § 236 include the proceeds of fraud; and (2) Does a spouse pay "fair

In his papers in support of this motion, Walsh asserted that, notwithstanding the fact that the home was titled in Janet's name, it was a joint asset under N.Y. Domestic Relations Law § 236. That provision generally provides that an asset acquired by either or both spouses during the marriage and before the execution of a separation agreement is a joint marital asset, "regardless of the form in which title is held." However, even under Walsh's argument, the fact is that, prior to his divorce, Walsh owned only *half* of the house. After his divorce, Walsh owned an undivided interest in the entire property. As the Second Circuit has recognized in this very case, "a separation agreement can serve as a conveyance from the marital estate to divorcing individuals within the meaning of New York Real Property Law § 290(3), which defines 'conveyance' to include 'every written instrument, by which any estate or interest in real property is created.'" *CFTC* v. *Walsh*, 618 F.3d at 227-28 (citing *FDIC* v. *Malin*, 802 F.2d 12, 17 (2d Cir. 1986)). This conclusion is supported by the fact that on or about December 22, 2006, Walsh filed a deed with the Nassau County Clerk reflecting that the Half Moon Lane Home had been transferred to him.[6]

Nor can Walsh seriously contest the fact that funds were transferred directly from the WG Investors account to Schaberg in satisfaction of his obligations under the Separation Agreement. Between August 2000 and February 2009, more than $18 million was wired from

---

consideration" according to the terms of N.Y. Debtor and Creditor Law § 272 when she relinquishes in good faith a claim to the proceeds of fraud. *CFTC* v. *Walsh*, 618 F.3d at 231-32.

[6]     Moreover, Schaberg has asserted in her brief to the New York State Court of Appeals that her transfer of the Half Moon Lane Home to Walsh constituted "concrete consideration with a substantial cash value" and argues that Walsh had made the transfer of the home to him a "critical term in their divorce negotiations."  Brief For Relief Defendant-Appellant Janet Schaberg, *CFTC* v. *Walsh*, Case No. 09-3787 and 09-3742, at 61-62  (N.Y. Ct. App.) (January 10, 2011).

the WG Investors account at Merrill Lynch to bank accounts registered in Schaberg's name.

*CFTC* v. *Walsh*, 618 F.3d at 221-22.  Approximately $6.1 million of these transfers on their face

relate directly to the Separation Agreement.  In light of this indisputable evidence, this is not a

case where the disputed issue at the *Monsanto* hearing is the tracing of the funds.

Finally, as the Government has previously argued, we expect that the evidence

will show that funds were transferred from the WG Investors bank account to Walsh's bank

account from 2004 through 2009, and thereafter used to pay expenses related to the Half Moon

Lane Home.

### III.    *Monsanto* Precludes Exposure of Government Witnesses at a Pretrial Hearing

We have been advised that the defense intends to subpoena Paul Greenwood and

Deborah Duffy, and Brick Kane, Chief Operating Officer of the Receiver, and possibly other

witnesses, to testify at the hearing.  These subpoenas should be quashed.  *Monsanto* itself

precludes the defense from using the *Monsanto* hearing as an excuse to gain access to the

Government's witnesses or otherwise converting the *Monsanto* hearing into a "dress rehearsal"

for the trial.  By serving subpoenas on the cooperating witnesses, and the Receiver, the defense is

trying to achieve precisely that objective.[7]  This result is contrary to what the Court of Appeals

intended in *Monsanto*.

The Second Circuit's decision in *Monsanto* that a defendant is entitled to post-

restraint, pre-trial probable cause hearing was based upon traditional due process analysis.  The

*Monsanto* court summarized the factors to be weighed in a due process analysis as follows:

---

[7]     The Government has already produced 3500 material for Special Agent Barnacle
to the defense, which includes his notes and memoranda of interviews with the cooperating
witnesses.  Thus, the defense is well aware of their statements to the Government.

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Monsanto*, 924 F.2d at 1193 (quoting *Mathews* v. *Eldridge*, 424 U.S. 319, 335 (1976)); *see also United States* v. *E-Gold, Ltd.*, 521 F.3d 411 (D.D.C. 2008).   After considering these factors, the Second Circuit, en banc, decided that a pretrial adversary hearing addressing the existence of probable cause as to both the commission of the offense and the forfeitability of the specified property "affords a procedural safeguard of substantial value," and that the due process balance "manifestly tilts in favor of the pretrial hearing *that we have outlined.*"  *Monsanto*, 924 F.2d at 1197-98 (emphasis added).

  Notably, the Second Circuit took into account the Government's interest in avoiding the premature disclosure of its witnesses and trial strategy in outlining the structure of a *Monsanto* hearing.  The court recognized that Congress had criticized courts that had authorized hearings at which a defendant could challenge the validity of an indictment in an effort to defeat an asset restraint, and quoted a provision of the applicable legislative history:

> Meeting such requirements can make obtaining a restraining order – the sole means available to the government to assure the availability of assets after conviction – quite difficult.  In addition, these requirements may make pursuing a restraining order inadvisable from the prosecutor's point of view because of the potential for damaging premature disclosure of the government's case and trial strategy and for jeopardizing the safety of witnesses and victims in racketeering and narcotics trafficking cases who would be required to testify at the restraining order hearing.

*Monsanto*, 924 F.2d at 1197 (quoting S. Rep. No. 225, 98th Cong., 2d Sess. 196, *reprinted in* 1984 U.S. Code Cong. & Admin. News 3182, 3379).  Recognizing that there was some merit to

18

these concerns, the Court held:

> As indicated hereinabove, however, the Federal Rules of Evidence would not be
> followed in the pretrial hearings that this opinion would require, thus allowing the
> use of hearsay testimony and *precluding unwarranted exposure of government
> witnesses*.  Indeed, this was the procedure followed on remand to the district court
> following *Monsanto I*.

924 F.2d at 1198 (emphasis added); *see also id.* at 1199 ("our ruling that a district court would

not be bound by the Federal Rules of Evidence at a post-indictment, pretrial hearing deals with

the problem of premature disclosure of government witnesses").  This approach has been adopted

by other courts that have followed *Monsanto*.  *See, e.g.*, *E-Gold*, 521 F.3d at 419, 421 (noting

that the trial court can invoke protections necessary to protect the Government's evidence from

premature disclosure); *United States* v. *Jones*, 160 F.3d 641, 647 (10th Cir. 1998)("In any event,

exempting a post-restraint, pre-trial hearing from the constraints of the Federal Rules of Evidence

would permit the government to conceal timid witnesses through the use of hearsay and

proffer.")(citing *Monsanto*, 924 F.2d at 1198).

   The probable cause hearing outlined by the Second Circuit is therefore limited to

the question of whether the Government can, through the evidence that it proffers, meet its

probable cause burden.  Indeed, the Government is expressly authorized to offer hearsay

evidence so as to avoid precisely the result the defendant seeks in this case: giving the defense a

free shot at the Government's witnesses in advance of the trial.  By contrast, allowing the defense

to make an end-run around *Monsanto* by serving subpoenas on the cooperating witnesses places

the Government in an unfair position: the Government would have to bear the risk that the

defense will subpoena its witnesses solely to create impeachment material for use at trial *or* forgo

a restraint on an asset that could otherwise be used to compensate investors.  *Monsanto* expressly

declined to force the Government to make this choice.[8]

Moreover, the defense has not and cannot demonstrate any relevance in the testimony it seeks to compel. The defense has access to all of the interview notes for the cooperating witnesses, and can elicit statements that they made to the Government (or *Giglio* material relating to the cooperating witnesses) during their cross-examination of Special Agent Barnacle. These witnesses have no exculpatory information to provide at the hearing; indeed, their information is highly *inculpatory* of Walsh. Nonetheless, if the defense believed that the witnesses did have exculpatory information, they could elicit that through Special Agent Barnacle. The only possible reason for calling them is to impeach them, which is manifestly improper in a hearing at which the Government bears only the modest burden of demonstrating probable cause.

We also question the relevance of the need to subpoena Mr. Kane, the Chief Operating Officer of the Receiver. As noted above, the Receiver's work has consisted primarily of forensic accounting of the books and records of WG Trading. The results of that forensic accounting is set forth in some detail in the Receiver's publicly filed reports. Tracing is not an issue because the funds went directly from the WG Investors account to Schaberg. Thus, once the Government has established probable cause to believe that Walsh has committed the charged crimes, the question becomes whether his acquisition of the undivided interest in the Half Moon Lane Home pursuant to the Separation Agreement is traceable to the fraud. Because of the

---

[8]     Although not binding here, the District Court in *United States* v. *Simpson*, No. 09 Cr. 249, 2011 WL 195676 at *6 (N.D. Tx. January 20, 2011), aptly summarized the Government's concerns: "[t]he government should not be required to put on a dress rehearsal performance of part or all of its case-in-chief as the price for protecting its valid interest in preserving assets that are allegedly subject to forfeiture."

clarity of the bank records, this is a legal question, not a factual one.

The Government's burden at this hearing is limited to probable cause to believe that Walsh had committed the fraud charged in the indictment and that his interest in the house is traceable to the fraud; the Government need not disprove all defense theories, nor must it prove its case beyond a reasonable doubt. The defense will, of course, have their opportunity to examine all of the Government witnesses at trial. However, defense efforts to preview and attack the Government's entire case against Walsh through a limited *Monsanto* hearing is improper, a waste of judicial resources, and directly contradictory to the permissible hearing outlined in the *Monsanto* decision itself.

## CONCLUSION

For the reasons set forth above, and in its prior submissions, the Government requests that the Court find that the Government has established that there is probable cause to believe that Walsh's interest in the Half Moon Lane Home is traceable to the fraud charged in the Indictment.

Dated: New York, New York
        March 17, 2011

Respectfully submitted,

PREET BHARARA
United States Attorney for the
Southern District of New York

By: _____
    John J. O'Donnell
    Marissa Molé
    Assistant United States Attorneys
    (212) 637-2490/2275

## AFFIRMATION OF SERVICE

I, John J. O'Donnell, affirm under penalty of perjury as follows:

1.     I am an Assistant United States Attorney in the Southern District of New York.

2.     On March 17, 2011, I caused a copy of the foregoing document to be filed and served via the Court's ECF system to the following:

Glenn C. Colton,Esq.
Sonnenschein Nath & Rosenthal LLP
1221 Avenue of the Americas
New York, NY 10020-1089
Direct: 212.398.5797
Mark A. Flessner, Esq.
Sonnenschein Nath & Rosenthal LLP
233 South Wacker Drive, Suite 7800
Chicago, IL 60606
Direct: 312.876.3136
Attorneys For Defendant Stephen Walsh


Dated: New York, New York
       March 17, 2011


JOHN J. O'DONNELL
Assistant United States Attorney
(212) 637-2490