UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

    -vs.-

STEPHEN WALSH,

           Defendant.

**09 Cr. 722 (MGC)**

**SENTENCING MEMORANDUM OF
DEFENDANT STEPHEN WALSH**

Michael Tremonte
Justin M. Sher
Valerie A. Gotlib
SHER TREMONTE LLP
80 Broad Street, Suite 1301
New York, New York 10004
Tel:  212.202.2600
Fax:  212.202.4156
E-mail:  jsher@shertremonte.com

*Attorneys for Defendant Stephen Walsh*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...............................................................................1

FACTUAL BACKGROUND..................................................................................1

    I.    Stephen Walsh's Personal Background and Character ......................................1

        A.    Childhood, Early Adulthood and Alcoholism............................................1

        B.    Early Career, Marriage and Children ........................................................3

        C.    WGTC and WGTI....................................................................................7

        D.    Charitable and Community Activities .......................................................8

        E.    Disengagement from Business...................................................................8

    II.    Charges, Plea, PSR and Guidelines Calculation...........................................10

        A.    Charges and Plea Allocution...................................................................10

        B.    Presentence Report .................................................................................11

        C.    Guidelines Calculation ...........................................................................12

    III.    SEC Proceedings and the Return of Approximately 99 Percent of Investors' Principal 13

ARGUMENT........................................................................................................15

    I.    The Parsimony Clause under 18 U.S.C. § 3553(a) ........................................16

    II.    Imposition of a Guidelines Sentence of Twenty Years Would be Unreasonable ..........17

        A.  The Loss Amount Calculation Under the Fraud Guideline Unduly Emphasizes Loss Amount ..................................................................................17

        B.  The Fraud Guideline Sentence Calculation Ignores Dramatic Differences in Defendants' Relative Culpability..........................................................19

        C.  The Fraud Guidelines Effectively Make Loss Amount the Only Relevant Factor in Sentencing................................................................................21

        D.  Numerous Courts have Imposed Below-Guidelines Sentences in Cases Where the Guidelines Loss Amount Calculation Overstates the Seriousness of the Offense............22

    III.    A Substantially Below-Guidelines Sentence with Strict Conditions of Supervised Release Is Appropriate In This Case ................................................26

        A.    Nature and Circumstances of the Offense ..............................................26

        B.    History and Circumstances of Mr. Walsh................................................32

        1.    Dedication to Family ..............................................................................33

        2.    Efforts on Behalf of Community and Charitable Organizations................36

        3.    Devoted Friend.......................................................................................39

        4.    Alcoholics Anonymous ...........................................................................42

        C.  A Substantially Below-Guidelines Sentence Including Mandatory Community Service Will Satisfy the Goals of Sentencing Under 18 U.S.C. § 3553(a) ...................44

CONCLUSION.....................................................................................................47

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Armstrong v. Collins*,
  No. 01-cv-02437 (PAC), 2010 WL 1141158 (S.D.N.Y. Mar. 24, 2010)................................26

*Cunningham v. Brown*,
  265 U.S. 1 (1924)..........................................................................................................27

*Gall v. United States*,
  128 S. Ct. 586 (2007) ....................................................................................................16

*In re Bennett Funding Grp., Inc.*,
  253 B.R. 316 (Bankr. N.D.N.Y. 2000)..........................................................................27

*In re Bernard L. Madoff Inv. Sec. LLC*,
  458 B.R. 87 n.15 (Bankr. S.D.N.Y. 2011)......................................................................26

*Kimbrough v. United States*,
  552 U.S. 85 (2007)........................................................................................................18

*Koon v. United States*,
  518 U.S. 81 (1996)........................................................................................................16

*Pepper v. United States*,
  131 S. Ct. 1229 (2011) ..................................................................................................16

*S.E.C. v. Credit Bancorp, Ltd.*,
  290 F.3d 80 (2d Cir. 2002) ...........................................................................................26

*United States v. Adelson*,
  441 F. Supp. 2d 506 (S.D.N.Y. 2006)......................................................................17, 25

*United States v. Allmendinger*,
  706 F.3d 330 (4th Cir. 2013) ........................................................................................28

*United States v. Babar*,
  512 F. App'x 78 (2d Cir. 2013)......................................................................................32

*United States v. Booker*,
  543 U.S. 220 (2005)......................................................................................................22

*United States v. Canova*,
  412 F.3d 331 (2d Cir. 2005) ..........................................................................................45

*United States v. Cavera*,
    550 F.3d 180 (2d Cir. 2008) ..................................................................16, 19

*United States v. Cooper*,
    394 F.3d 172 (3d Cir. 2005) ..........................................................................45

*United States v. Corsey*,
    723 F.3d 366 (2d Cir. 2013) ...................................................................*passim*

*United States v. Crouse*,
    145 F.3d 786 (6th Cir. 1998) ........................................................................45

*United States v. Esso*,
    486 F. App'x 200(2d Cir. 2012) ...................................................................32

*United States v. Greene*,
    249 F. Supp. 2d 262 (S.D.N.Y. 2003) ..........................................................45

*United States v. Gupta*,
    904 F. Supp. 2d 349 (S.D.N.Y. 2012) ....................................................21, 24

*United States v. Harris*,
    689 F. Supp. 2d 692 (S.D.N.Y. 2010) ..........................................................30

*United States v. Howe*,
    543 F.3d 128 (3d Cir. 2008) ..........................................................................45

*United States v. Levenson*,
    314 F. App'x 347 (2d Cir. 2008) ..................................................................23

*United States v. Marsh*,
    No. 10-cr-0480, 2011 WL 5325410 (E.D.N.Y. Oct. 26, 2011) .....................30

*United States v. Mohammed*,
    315 F. Supp. 2d 354 (S.D.N.Y. 2003) ..........................................................19

*United States v. Mohan*,
    62 F. App'x 372 (2d Cir. 2003) ....................................................................23

*United States v. Ovid*,
    No. 09-cr-00216 (JG), 2010 WL 3940724 (E.D.N.Y. Oct. 1, 2010) .............27

*United States v. Parris*,
    573 F. Supp. 2d 744 (E.D.N.Y. 2008).........................................................25

*United States v. Ranum,*
    353 F. Supp. 2d 984 (E.D. Wis. 2005) ........................................................20

*United States v. Restrepo,*
    936 F.2d 661 (2d Cir. 1991) ......................................................................23

*United States v. Rostoff,*
    53 F.3d 398 (1st Cir. 1995).........................................................................30

*United States v. Schneider,*
    930 F.2d 555 (7th Cir. 1991) .....................................................................27

*United States v. Serafini,*
    233 F.3d 758 (3d Cir. 2000) ......................................................................45

*United States v. Shuster,*
    331 F.3d 294 (2d Cir. 2003) ......................................................................45

*United States v. Speight,*
    75 F. App'x 802 (2d Cir. 2003)..................................................................23

*United States v. Spencer,*
    700 F.3d 317 (8th Cir. 2012) .....................................................................21

*United States v. Turk,*
    626 F.3d 743 (2d Cir. 2010) ......................................................................30

*United States v. Viloski,*
    557 F. App'x 28 (2d Cir. 2014)..................................................................22

## STATUTES

15 U.S.C. § 78j(b) ...............................................................................................10
15 U.S.C. § 78ff ..................................................................................................10
17 U.S.C. § 240.10b-5.........................................................................................10
18 U.S.C. § 3553(a) ......................................................................................*passim*

## RULES

U.S.S.G. § 2B1.1...........................................................................................*passim*
U.S.S.G. § 3E1.1(b) .............................................................................................12
U.S.S.G. § 5G1.1(a) .............................................................................................13

## PRELIMINARY STATEMENT

The conviction in this case represents an aberration for a man whose personal history and characteristics overwhelmingly demonstrate a life-long commitment to the values of hard work, education, family, charity and respect for the law.  Stephen Walsh's guilty plea stands in stark contrast to his honest, hard-won and admired accomplishments as a professional, father, friend and philanthropist over the course of his seventy-plus years.  The extent to which Mr. Walsh's securities fraud conviction is incommensurate with every other aspect of his life and character makes this case extraordinary.  It is also extraordinary because nearly ninety-nine percent of the principal that was invested with Mr. Walsh and his co-defendants will be returned to investors, all of which was deployed in real investments.  Accordingly, and for the reasons discussed in detail below, we respectfully submit that a substantially below-Guidelines sentence with the condition of mandatory community service will suffice to achieve the sentencing purposes of 18 U.S.C. § 3553(a).

## FACTUAL BACKGROUND

### I.   STEPHEN WALSH'S PERSONAL BACKGROUND AND CHARACTER

#### A.   Childhood, Early Adulthood and Alcoholism

Mr. Walsh was born in New York City in 1944.  *See* Presentence Report for Stephen Walsh ("PSR"), dated September 29, 2014, ¶ 45.  Mr. Walsh's mother was in her teens at the time.  *See* PSR ¶ 45.  Mr. Walsh's father, who worked as a truck driver, was an emotionally and physically abusive alcoholic.  *See id.* ¶¶ 45, 46.  He was prone to violent rage against Mr. Walsh and his mother.  *See id.* ¶ 46.  Mr. Walsh's father physically abused him as a child and, for as long as he can remember, his father also physically abused his mother.  *See id.*

Mr. Walsh's family did not discuss their father's abusive behavior outside of the home.  Referring to his alcoholism and violence against his own family, his mother would say that Mr. Walsh's father was "sick." *See id*.

As an adolescent, Mr. Walsh stood up to his father, and the physical abuse ended. *See id*.  However, his father continued to abuse Mr. Walsh's mother and his two sisters emotionally.  Mr. Walsh did, however, protect his two younger sisters from physical abuse by his father.  *See id.* ¶ 46.  To this day, Mr. Walsh remains close with them and is a loving uncle to his nieces and nephews.  *See id*. ¶ 47; *see also* Exs. 6 (Letter of Gary Monahan), 14 (Letter of Barbara Walsh Monahan), 43 (Letter of Bonnie & Thomas Strobel).

Growing up, Mr. Walsh was preoccupied with trying to hide the circumstances of his home life, and in particular his father's alcoholism.  Mr. Walsh also suffered from undiagnosed attention deficit disorder, which interfered with his academic and social development.  As a consequence, he experienced difficulties "fitting in" and struggled with very low self-esteem.  He was fearful of the outside world and full of resentment against his father.  He abhorred alcohol growing up and swore that he would never drink.

Unfortunately, Mr. Walsh's resolve to avoid alcohol did not last.  In his first year of college, seeking social acceptance, he tried alcohol.  *See id*. ¶ 57.  Within a short time, he came to believe that he needed it to function and feel accepted.  From college forward, Mr. Walsh was an alcoholic.  Although he was high-functioning, and succeeded in concealing his alcoholism from friends and colleagues, he was nevertheless an addict.  *See id*.

When Mr. Walsh was thirty years old, his father, who was fifty-five at the time, joined Alcoholics Anonymous ("AA") and urged Mr. Walsh to do the same.  *See id*. ¶ 47.  He resisted the suggestion at that time.  *See id*.  Gradually, Mr. Walsh's relationship to his father

changed for the better. *See id.* He came to understand that his father was a good person, who suffered from a terrible disease. Despite seeing the positive impact AA had on his father's life, however, Mr. Walsh resisted joining. His alcoholism escalated in severity until, following his arrest in 2009, it was causing him to black out several times each month. *See id.* ¶ 57. With his daughter's encouragement, Mr. Walsh joined AA in February 2013 and has been sober ever since. *See id.* As discussed below, joining AA profoundly affected his life.

**B.     Early Career, Marriage and Children**

Mr. Walsh graduated from the University of Buffalo in 1966 with a degree in Political Science. *See id.* ¶ 58. Shortly thereafter, in 1966, Mr. Walsh married Diane "Ronnie" Lindenberg, whom he had met in college. *See id.* ¶ 49. During the early years of their marriage, Mr. Walsh and Ms. Lindenberg lived in Queens, New York, and, later in Chicago, Illinois. *See id.* ¶ 48. While they were living in Chicago, in 1969, their first son Michael was born. *See id.* ¶ 49. Subsequently, Mr. Walsh and Ms. Lindenberg moved to Rockville Center, New York, where they resided for ten years prior to their divorce. *See id.*

Immediately upon graduating from college, Mr. Walsh began working on Wall Street. He began his career at Saul Lerner and Company ("Lerner"), where he worked as an options trader. *See id.* ¶ 68. It was apparent early in his career that he had a talent for pricing and trading options. He dedicated himself to his job and, by the time he was twenty-four, he was running his own office for Lerner in Chicago, Illinois.

After four years at Lerner, Mr. Walsh left Chicago and moved back to New York, where he accepted a position as manager of the options department at Reich and Company ("Reich"). He worked at Reich for approximately one year before co-founding Ragnar Options ("Ragnar"). *See id.* ¶ 67.

3

Ragnar was focused exclusively on options trading.  *See id.* ¶ 66.  In 1974, Mr. Walsh left Ragnar to join the Clark Dodge Company ("Clark"), where he worked as the co-manager of the options department.  *See id.* ¶ 66.  Approximately six months after Mr. Walsh joined Clark, it was purchased by Kidder Peabody ("Kidder").  Mr. Walsh became a partner of Kidder and managed its options department.  *See id.* ¶ 65.

Although he prospered at work, Mr. Walsh's marriage and home life suffered as the result of his alcoholism.  *See id.* ¶ 49.  After several years of marital difficulty, during which they attempted to save the marriage, Mr. Walsh and Ms. Lindenberg divorced in 1980.  *See id.* Notwithstanding the divorce, Mr. Walsh remained close to Ms. Lindenberg until her death in 1988 from polymyositis, a rare muscle disease.  *See* Exs. 12 (Letter of Michael Walsh), 16 (Letter of Janet Schaberg).

Mr. Walsh continued to prosper professionally and developed an excellent reputation on Wall Street as an options trader.  Despite his young age, Mr. Walsh became a "respected legend in the field of Options Trading."  Ex. 16.

Mr. Walsh first met his co-defendant, Paul Greenwood, at Kidder.  At that time, Mr. Greenwood was a quantitative analyst, working in Chase Bank's Trust Department, which was a client of Kidder.  Mr. Walsh was immediately struck by Mr. Greenwood's intelligence and, in particular, by his mathematical skills.   He admired Mr. Greenwood's academic achievements, which included earning a Ph.D. in economics by the time he was twenty-one.  At the time, there were few quantitative analysts working on Wall Street, and Mr. Walsh recognized that Mr. Greenwood had the competence and instincts to be very successful.

By 1979, Mr. Walsh had multiple offers to leave Kidder, including one from Merrill Lynch (ōMLö).  Specifically, ML had offered him the opportunity to manage its entire proprietary equities and derivatives trading department.  Around the same time, after doing business together for approximately two years, Mr. Greenwood requested a meeting with Mr. Walsh.  Mr. Greenwood told Mr. Walsh he wanted to start a business together and claimed that a member of the Rockefeller family was prepared to give him $50 million to invest.  He wanted Mr. Walsh to establish a company with him to manage the investment.  Although the Rockefeller investment did not materialize, Mr. Walsh agreed to go into business with Mr. Greenwood.  They shared a conviction that they could profitably trade options, which had become increasingly popular on Wall Street, and Mr. Greenwood committed to building a computer system to facilitate that goal.

Mr. Walsh recruited Barry Wish, a former Kidder partner, to join them in forming Walsh Greenwood & Wish (ōWGWö), in 1979.  Ultimately, Mr. Wish was able to raise $4 million in start-up capital, of which they invested $1 million in computers.  WGW utilized an arbitrage trading strategy.  On the ōconversionö side of the position, WGW purchased stock, ōlongö puts and sold calls, which required the up-front expenditure of cash.  On the ōreverseö side of the strategy, WGW shorted stock, and purchased puts and bought calls, which generated cash.

In 1981 and until 1982, WGW began marketing its proprietary computer trading technology to competitors.  In approximately 1985, WGW sold its technology business to Wang Laboratories and shifted its focus to merger arbitrage.

In approximately 1983, Mr. Walsh and Mr. Greenwood bought out Mr. Wish's interest in the business and changed the name to Walsh Greenwood ("WG").  Mr. Walsh was the CEO of WG and Mr. Greenwood was CFO.  Initially focused on options and derivatives trading, over the years WG became involved in a wide variety of investments and trading strategies.

In October 1979, WGW hired its first employee, Janet Schaberg.  Ms. Schaberg was an options trader, who represented WGW on the American Stock Exchange ("AMEX").  *See* Ex. 16.  Ms. Schaberg was the first female active trader on the AMEX trading floor.  *See id.*  As a young woman in a male-dominated industry, Ms. Schaberg struggled with issues unknown to her male peers but found Mr. Walsh and Mr. Greenwood to be "very supportive of her work."  *Id.*

Mr. Walsh and Ms. Schaberg married in 1981.  In 1982, they had their first child, Andrew.  A short time later, they had a second child, Sarah.  Mr. Walsh's son by his previous marriage, Michael, regularly visited the Walsh household.  *See id.*  In 1985, Mr. Walsh and Ms. Schaberg welcomed Janet's ten year old nephew, Adam, into their home, after Janet's sister became unable to raise him.  *See id.*   Adam lived with the Walsh family until he was twenty-two. *See id.*  As Janet describes it, their "home was filled with love and joy, three boys and a darling girl." *Id.*  She further describes how "Steve was very hands-on with the boys, and would participate in all of their sports, whether it was coaching or practice."  *Id.*

Mr. Walsh coached both Michael and Andrew in baseball, coached Andrew in basketball and attended all of Andrew's hockey practices.  Of his three children, Sarah excelled the most in sports.  Sarah remembers when she was a little girl "battling to stay up past bedtime to watch sports games with Dad, just to be by his side."  Ex. 1 (Letter of Sarah Walsh).  Sarah was the captain of her lacrosse team at Johns Hopkins University, from which she earned a bachelor's degree in economics in 2006.  Sarah "literally can't remember one sporting event I

played in that he didn't attend and I played three sports in high school and travelled the country playing lacrosse in college.ö *Id.*  Sarah notes that Mr. Walshøs dedication to supporting his children in their athletic endeavors õis just one example of the level of commitment my Dad has towards his family ó we mean everything to him, and he means everything to us.ö *Id.*

Michael, Andrew, and Sarah are now adults ó ages 45, 31 and 30 respectively. Since graduating from the University of Arizona, Michael has raised two children, C.W. (16) and M.W. (14), and has become a successful restaurateur on Long Island, where he resides with his family.  *See* Ex. 12.  Michael and his family moved to Long Island in 2001 so they could be closer to Mr. Walsh.  *See id.*  Andrew attended college at the University of Miami at Ohio before moving back to New York, where he currently resides with his wife.  *See* PSR ¶ 50.  Andrew is employed as the director of finance for a commercial real estate group, and his wife works as a speech therapist for the New York City Department of Education.  *See id.*  Sarah now works as a proprietary energy trader with the Noble Group in New York, where she lives with her husband, John Kenyon, who works for Deutsche Bank.  *See id.*; Ex. 44 (Letter of John Kenyon).

### C.    WGTC and WGTI

In the late 1980s, WGøs assets under management grew from $4 million to approximately $65 million.  WG became increasingly focused on the index arbitrage trading strategy.  In sum, the index arbitrage strategy entails simultaneously buying all of the stocks in a given index, on the one hand, and selling futures corresponding to those stocks against the index, on the other hand.

In approximately 1990, Mr. Walsh and Mr. Greenwood decided to move away from mergers and acquisitions and to focus principally on the index arbitrage strategy.  Toward that end, they formed WG Trading Company (õWGTCö), a limited partnership.  WGTC was

registered with the U.S. Securities and Exchange Commission ("SEC") as a broker-dealer and registered with the U.S. Commodities and Futures Trading Commission ("CFTC") as a commodity pool operator.  Subsequently, they formed W.G. Trading Investors ("WGTI"), which was also a limited partnership.  WGTI, which was a limited partner in WGTC, was not registered with the SEC or CFTC.

### D.    Charitable and Community Activities

Mr. Walsh has devoted a tremendous amount of time and energy to supporting and raising money for multiple charitable causes.  For example, he has served as an associate trustee and co-chairman of the cardiology department at North Shore Long Island Jewish Hospital; as member of the board of directors of the U.S. Lacrosse Foundation; as trustee of the University of Buffalo Foundation; and as member of the board of directors and, while his children were in grammar and middle school, as commissioner of the boys basketball program for the Port Washington Youth Association.  *See* PSR ¶ 70.  In 1988, four years after Ms. Schaberg's father passed away from Alzheimer's, Mr. Walsh was instrumental in assisting his then-wife Janet Schaberg in founding the Long Island Alzheimer's Foundation ("LIAF").  Exs. 1, 18 (Letter of Linda Cronin).  Ms. Schaberg credits Mr. Walsh as the impetus for her involvement in advocating "for people with Alzheimer's disease and their caregivers."  Ex. 1.  LIAF has been continuously serving the Long Island community of Alzheimer's patients and their families for over twenty-six years.

### E.    Disengagement from Business

In the early 1990s, Mr. Walsh moved to an office in North Hills, Long Island. Mr. Walsh's North Hills office was nearly an hour's drive from WG's main office in Greenwich, Connecticut, which was run by Mr. Greenwood.  As FBI Special Agent Barnacle testified at the

*Monsanto* hearing that was conducted in this case on May 24, May 25 and June 28, 2011, by the late 1990s, Mr. Greenwood had taken over "the more primary role" in running WGTC and WGTI, both in terms of soliciting clients and maintaining the books and the bank accounts.  *See* May 24 Tr. at 84:3-25; *see also id*. at 82:6-10.  Mr. Walsh "wasn't involved in the direct solicitation of clients."  *Id*.  He was effectively removed from that role at the insistence of Mr. Greenwood, who proposed to "assume [sole] responsibility of doing the closings and sales presentations"; thereafter, "Mr. Greenwood went to sales presentations and Mr. Walsh no longer went."  *Id*. at 83:4-22; *see also* June 28 Tr. at 4:11-12 ("Mr. Walsh was cut out of the presentations").  Mr. Walsh did not participate in preparing or maintaining financial records. *See* May 25 Tr. at 270:22-25.

WGTC's head trader understood that Mr. Greenwood dealt with the banks and investors and handled all of the firm's finances, while Mr. Walsh "did not play much of a role at the firm."  June 28 Tr. at 7:7-13.  Mr. Greenwood "was much more in control," May 25 Tr. at 294:1-4, and "had a much more active role in the company."  *Id*. at 311:15-24.  Mr. Greenwood ran the business, while Mr. Walsh, in his separate office in a different state, "was doing other endeavors" and "was involved in many other partnerships and investments."  *Id*.  Monthly fund performance figures were prepared with information supplied by Mr. Greenwood, not Mr. Walsh. *Id*. at 334:10-16.

Deborah Duffy, who has admitted to participating in the fraud, told the Government that she worked for Mr. Greenwood and regarded him, rather than Mr. Walsh, as her boss; indeed, she sought Mr. Greenwood's permission, rather than Mr. Walsh's, before engaging in acts she knew to be illegal.  *See* May 25 Tr. at 356:12-359:11.  Mr. Walsh's role was

so limited that he "did not use a computer," *id*. at 295:11-12, and signed a handful of documents

each week, which were sent to him by Mr. Greenwood and Ms. Duffy.  *See* May 24 Tr. at

149:18-150:5.

In the early 2000s, Mr. Walsh and his second wife began having serious marital

difficulties.  His efforts to keep his marriage together further distracted Mr. Walsh's attention

from work.  By 2006, Mr. Walsh and Ms. Schaberg were separated and had resolved to divorce.

*See* PSR ¶ 50.  The failure of his second marriage and the divorce process took a heavy toll on

Mr. Walsh.  His role in WGTC and WGTI, already diminished, became even more attenuated.

## II.     CHARGES, PLEA, PSR AND GUIDELINES CALCULATION

### A.     Charges and Plea Allocution

Mr. Walsh was arraigned on July 31, 2009 together with Mr. Greenwood on

charges of conspiracy to commit securities fraud, securities fraud, wire fraud, commodities fraud

and money laundering.  *See* Indictment, 09-cr-00722 (MGC) ("Indictment"), filed July 24, 2009,

¶¶ 1-23.  The Indictment alleges generally that, between 1996 and February 2009, Mr. Walsh and

Mr. Greenwood defrauded the institutional investors in WGTC and WGTI by misrepresenting

the use of the invested funds and by misappropriating some of those funds for their personal use.

The complaint specifically alleges that the defendants, in order to conceal their fraud, issued

false promissory notes to WGTI, which were listed as assets on the books of WGTI.  *See*

Complaint, 09-cr-00722 (MGC), dated February 24, 2009, ¶¶ 18-19.

Pursuant to a written plea agreement, Mr. Walsh pleaded guilty to Count Two of

the Indictment, which charges him with securities fraud in violation of 15 U.S.C. § 78j(b) and

78ff, and 17 U.S.C. § 240.10b-5.  This charge carries a maximum sentence of twenty years'

imprisonment.  *See* Plea Agreement of Stephen Walsh ("Plea Agreement"), dated April 21, 2014.

At his plea hearing on April 25, 2014, Mr. Walsh allocuted to having "caused WGTI, an entity whose financial information was incorporated into audited financial statements of WGTC, to issue promissory notes that falsely stated that I owed and would timely repay tens of millions of dollars to WGTI," Plea Tr. at 16, and that he "did so knowing that the books and records of WGTC would be materially misstated as a result, and that such misstatements would and did operate as a fraud and deceit upon WGTC's limited partners." *Id*. at 17.

**B.      Presentence Report**

The PSR describes the offense conduct as covering an extended time period, from 1996 through February 2009.  Yet, as acknowledged in the PSR, "[t]hroughout the charged time period Walsh's direct involvement with investors was *de minimis* in comparison to Greenwood's involvement with investors.  This is supported by the testimony given by Agent Barnacle throughout the Monsanto hearing acknowledging that "it was Greenwood who was responsible for marketing to investors and negotiating finances."  PSR ¶ 16 n. 2 (citing examples from the Monsanto hearing transcript).

The clarifying footnote, which accurately reflects the fact that Mr. Walsh did not participate in marketing investments in either WGTC or WGTI to investors during the majority of the relevant period, underscores the extent to which the PSR generally overstates Mr. Walsh's role in the offense conduct.  Throughout the PSR, there are references to communications, conversations and decisions that "Greenwood and Walsh" engaged in.  For example, the PSR states that "*Greenwood and Walsh* told investors that WG[TI] was a pass-through entity, which meant that the funds would be received by WG[TI] . . . and would be passed through to WG[TC], where they would be invested pursuant to a specific trading strategy."  PSR ¶ 14 (emphasis added); *see also id*. ¶ 15 ("*Greenwood and Walsh* . . . solicited billions of dollars from

institutional investors") (emphasis added); *id.* ¶ 16 ("*Greenwood, Walsh, or Carder* would be brought in to explain the strategy and close the deal") (emphasis added); *id.* ¶ 19 ("*Greenwood and Walsh* had also inflated the returns that were reported to investors") (emphasis added).  Such indiscriminate pairing of Mr. Greenwood and Mr. Walsh overstates the extent of Mr. Walsh's culpability because, as the PSR notes, Mr. Walsh was not involved in making representations to investors or soliciting investments during the majority of the relevant period.

C.     **Guidelines Calculation**

Under the terms of the Plea Agreement, the parties stipulated to the following calculation under the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines"):

- The base offense level is 7, pursuant to U.S.S.G. § 2B1.1(a);

- The offense level is increased by 30 levels, because the loss amount exceeds $400 million, pursuant to U.S.S.G. § 2B1.1(b)(1)(P);[1]

- The offense level is increased by 2 levels, because the offense involved 10 or more victims, pursuant U.S.S.G. § 2B1.1(b)(2)(A)(i);

- The offense level is increased by 2 levels, because Walsh derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense set forth in Count Two, pursuant to U.S.S.G. § 2B1.1(b)(16)(A);

- The offense level is increased by 4 levels, because Walsh was associated with a registered broker dealer at the time he committed the offense, pursuant to U.S.S.G. § 2B1.1(b)(19)(a)(ii); and

- The offense level is decreased by 3 levels for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(b).

---

[1]     As discussed in detail below, the loss amount calculation under the Guidelines does not take into account the fact that approximately 99 percent of the principal invested in the WG entities has (or soon will be) returned.  As a result, the 30-level increase in the offense level calculation under U.S.S.G. § 2B1.1 produces a Guidelines sentence that is grossly disproportionate to Mr. Walsh's culpability.

Based on the foregoing stipulated Guidelines calculation, Mr. Walsh's offense level is 42.  Because Mr. Walsh has no prior convictions, his Criminal History Category is I.  A base offense level of 42 and Criminal History Category I results in a Guidelines range of 360 months to life imprisonment.  However, as noted, Count Two carries a statutory maximum of twenty years' imprisonment.  Accordingly, the stipulated Guidelines sentence is 240 months' imprisonment, pursuant to U.S.S.G. § 5G1.1(a).

## III.    SEC PROCEEDINGS AND THE RETURN OF APPROXIMATELY 99 PERCENT OF INVESTORS' PRINCIPAL

On February 25, 2009, the CFTC and SEC each filed complaints against Mr. Walsh and Mr. Greenwood alleging violations of the federal securities and commodities laws based on the same conduct alleged in the Indictment.  *See* Complaint, dated February 25, 2009, No. 09-cv-01750 (GBD), ECF No. 1 (the "SEC Action"); and Complaint, dated February 25, 2009, No. 09-cv-01749 (GBD), ECF No. 1 (the "CFTC Action").

Mr. Walsh entered into an agreement to settle the SEC Action on July 8, 2014, which was reduced to a judgment on the same date.  *See* Joint Letter to the Court dated August 8, 2014, No. 09-cv-01750 (GBD), ECF No. 744.  Mr. Walsh and the CFTC have also entered into an agreement to settle the CFTC Action.  *See* Consent Order of Permanent Injunction and Ancillary Equitable Relief Under the Commodity Exchange Act Against Defendant Stephen Walsh dated August 20, 2014, No. 09-cv-01749 (GBD), ECF No. 780.

In connection with the SEC and CFTC actions, Judge Daniels appointed Robb Evans & Associates LLC ("Receiver") as receiver of:  the WG entities, Mr. Greenwood's assets, Mr. Walsh's assets, and the assets of Mr. Walsh's ex-wife.  *See* Order, dated February 25, 2009, No. 09-cv-01750, ECF No. 2, at pp. 18-20.  The Receiver determined that the WGTC and WGTI investors' ("the WG Investors") claims, based on the amount of principal invested, totaled

$959,553,540.67.  *See* Memorandum in Support of Receiver's Motion for Orders Allowing

Claims and Approving the Receiver's Proposed Initial Distribution Plan, dated January 19, 2011,

No. 09-cv-01749, ECF No. 426 at 4.  As of January 19, 2011, the Receiver had secured and

liquidated the substantial assets of WGTC and WGTI for a total of $824,883,000.  *See id.*

On March 21, 2011, Judge Daniels entered an order directing the Receiver to

make an initial distribution to the WG Investors in the amount of $815 million.  *See* Order

Granting Motion for Orders Allowing Claims and Approving Receiver's Proposed Initial

Distribution Plan, dated March 21, 2011, No. 09-cv1749, ECF No. 468.

On December 28, 2012, Judge Daniels entered an order directing the Receiver to

make a second distribution to the WG investors in the amount of $40 million.  *See* Order

Granting the Receiver's Motion for Order Approving Second Distribution on Allowed Investor

Claims dated 12/28/2012, No. 09-cv-1750, ECF No. 628.   With the first two distributions,

approximately 89.1 percent of the WG Investors' principal had been returned.  *See* Letter of

Receiver to Court dated April 30, 2014, No. 09-cv-1750, ECF No. 723.

On November 11, 2013, Judge Daniels entered an order directing the Receiver to

make a third distribution to the WG investors in the amount of $50 million.  *See* Order Granting

Motion for Order Approving Third Distribution on Allowed Investor Claims, dated November

19, 2013, No. 09-cv-1750, ECF No. 698.  With the third distribution, the WG investors will have

recovered approximately $905 million – a 94.3 percent recovery rate of the WG investors'

principal.

The Receiver is recovering additional funds from the sale of various properties

and through clawback actions.  *See* Letter of Receiver to Court, dated August 29, 2014, No. 09-

cv-1750, ECF No. 755.  Upon distribution of the approximately $44.5 million that we estimate

the Receiver will recover by these methods, approximately $949.5 million will have been recovered by the investors – a recovery rate of approximately 99 percent.  Given that the investors will have recovered nearly their entire principal, as the Receiver noted (as early as December 2009), "the breadth and scope of this receivership is breathtaking. . . . It cannot be said that this is a typical receivership."  Memorandum in Support of First Application of Receiver for Compensation and Reimbursement, dated December 24, 2009, No. 09-cv-1750, ECF No. 250 at 9-10.

## **ARGUMENT**

Mechanical application of the Guidelines is this case would not be reasonable.  To the contrary, the imposition of the Guidelines sentence of 240 months' imprisonment would be grossly disproportionate to Mr. Walsh's culpability and dramatically in excess of a sentence that is "sufficient, but not greater than necessary" to comply with the purposes of 18 U.S.C. § 3553(a).  The imposition of a Guidelines sentence would also have the perverse result of subjecting Mr. Walsh to a degree of punishment comparable to – if not greater than – that imposed on the most notorious offenders, whose financial crimes devastated large numbers of vulnerable and unsophisticated individual investors and threatened systemic economic harm.  Mr. Walsh's wrongdoing, though unquestionably serious, bears no meaningful resemblance to such epochal criminality.  For the reasons discussed below, taking into account Mr. Walsh's history and circumstances and considering the nature and circumstances of his offense, we urge the Court to impose a substantially below-Guidelines sentence.

I.      THE PARSIMONY CLAUSE UNDER 18 U.S.C. § 3553(A)

        Section 3553(a) of Title 18 provides that "[t]he court shall in every case impose a

sentence sufficient, but not greater than necessary to comply with the purposes set out in

paragraph (2) of this subsection." 18 U.S.C. § 3553(a).  The duty embodied in this "parsimony

clause" applies at every federal sentencing "except as otherwise specifically provided." 18

U.S.C. § 3553(a).  Indeed, the command of the parsimony clause defines this Court's

"overarching duty."  *Pepper v. United States*, 131 S. Ct. 1229, 1243 (2011).

        Among the factors to be considered under § 3553(a) are:  (1) the nature and

circumstances of the offense, (2) the history and characteristics of the defendant, and (3) "the

need for the sentence imposed – (A) to reflect the seriousness of the offense, to promote respect

for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to

criminal conduct; [and] (C) to protect the public from future crimes of the defendant." 18 U.S.C.

§ 3553(a).

        As the Supreme Court reaffirmed in *Pepper*, in light of the long accepted

principle that "the punishment should fit the offender and not merely the crime," the "sentencing

judge [is] to consider every convicted person as an individual and every case as a unique study in

the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to

ensue." 131 S. Ct. at 1240(quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)).  While the

Guidelines are the "starting point and the initial benchmark," the Court "may not presume that

the Guidelines range is reasonable." *Gall v. United States*, 128 S. Ct. 586, 596-97 (2007).

Rather, the sentencing judge is directed to make an "individualized assessment" of the sentence

16

warranted öbased on the facts presented.ö *Id.* at 597.  The result is that ö[a] sentencing judge has

very wide latitude to decide the proper degree of punishment for an individual offender and a

particular crime.ö  *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008).

## II.    IMPOSITION OF A GUIDELINES SENTENCE OF TWENTY YEARS WOULD BE UNREASONABLE

In this case, the imposition of a Guidelines sentence would not be öreasonableö

within the meaning of *Gall*.  The Guidelines offense level ó and the corresponding Guidelines

sentence of 20 years ó is driven overwhelmingly by the Guidelines loss amount calculation,

which fails to take into account the economic reality of this case and displaces any meaningful

attention to the öindividualized assessmentö required under 18 U.S.C. § 3553(a) and *Gall*.  The

Guidelines loss amount calculation includes all of the money that was invested in the WG

entities during the relevant time period.  Yet, perversely, the Guidelines rules for calculating loss

amount *do not take into account* the fact that approximately 99 percent of the institutional

investorsø funds have (or soon will be) returned.  As multiple commentators have noted, tying

the calculation of a Guidelines sentence to the loss amount in this fashion often does not make

sense and, as in this case, yields absurd results.

### A.    The Loss Amount Calculation Under the Fraud Guideline Unduly Emphasizes Loss Amount

The Sentencing Guidelinesø overwhelming emphasis on loss amount in

determining the length of sentence in fraud cases lacks a cogent rationale, as numerous judges

and commentators have noted.[2]  For example, decrying the öinordinate emphasis . . . in fraud

---

[2]      Judgesø criticisms of these deficiencies have not gone unheeded.  In a press release issued
on August 14, 2014, the U.S. Sentencing Commission announced öits intention to consider
potential changes to the guidelines resulting from its multi-year review of federal sentences for
economic crimes.ö  Press Release, U.S. Sentencing Commission, U.S. Sentencing Commission
Selects Priorities for 2014-2015 Guidelines Amendment Cycle (Aug. 14, 2014) *available at*

cases on the amount of actual or intended financial loss," Judge Rakoff observed in *United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006), that the Guidelines, "because of their arithmetic approach and also in an effort to appear -objective,'tend to place great weight on putatively measurable quantities, such as . . . the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors." *Id.* (citing Kate Stith & Jose Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 69 (1998)).  Similarly, in testimony before the Sentencing Commission, Circuit Judge Jon O. Newman explained how the Guidelines'reliance on an incremental approach to culpability based on dollar amounts makes "no penological sense" in any context, since the amount of loss often has little to do with the actions or motivations of the defendant.  *U.S. Sentencing Commission Public Hearing Testimony and Transcripts* (July 9, 2009) (Statement of Judge Jon O. Newman).[3]  Moreover, as Judge Underhill noted in his concurring opinion in *United States v. Corsey*, 723 F.3d 366, 379 (2d Cir. 2013) (per curium), the loss guideline is not based on empirical study.  Rather, it was amended in 2001 and 2003 to increase offense levels for high-loss crimes in response to Congressional directives.  *See* U.S. Sentencing Comm'n, Report to the Congress: Increased Penalties Under the Sarbanes-Oxley Act of 2002, at 7 (2003); U.S.S.G. app.

---

http://www.ussc.gov/sites/default /files/pdf/news/press-releases-and-news-advisories/press-releases/20140814_Press_Release.pdf. According to Judge Patti Saris, Chair of the U.S. Sentencing Commission, the Commission has "been reviewing data and listening to key stakeholders to try to determine whether changes are needed in the way fraud offenses are sentenced in the federal system, particularly in fraud on the market cases" and "deciding whether there are ways the economic crime guidelines could work better." *Id*.

[3]     Judge Newman testified that "no criminal wakes up in the morning and decides that he is going to steal $4,000 dollars but not $6,000 dollars.  He might make a conscious decision to rob a convenience store rather than a bank, but once inside the convenience store, he opens the till and takes what is there.  The fortuity of whether the till contains $4,000 or $6,000 dollars should not result in added punishment." *U.S. Sentencing Commission Public Hearing Transcript* at 23-24 (held on July 9, 2009) (testimony of Judge Jon O. Newman) *available at* http://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20090709-10/Public_Hearing_Transcript.pdf.

C amend. 647 (Nov. 1, 2003). The fact that these increases were driven by political, rather than empirical considerations, without reference to a cogent rationale, limits their usefulness in calculating appropriate sentences in accordance with the mandates of 18 U.S.C. § 3553(a). Thus, as Judge Underhill cautioned in *Corsey*, "district judges can and should exercise their discretion when deciding whether or not to follow the sentencing advice [the loss] guideline provides." 723 F.3d at 379(citing *Kimbrough v. United States*, 552 U.S. 85, 109-10 (2007)).

> **B.**  **The Fraud Guideline Sentence Calculation Ignores Dramatic Differences in Defendants' Relative Culpability**

The U.S. Sentencing Commission's background note to the application of section 2B1.1 highlights the perils of mechanically applying the sentences generated by the loss table. The note states that, "along with other relevant factors under the guidelines, loss serves as a measure of the seriousness of the offense and the defendant's relative culpability." U.S.S.G. § 2B1.1 cmt. background (2013). However, the note also states that loss "is a principal factor in determining the offense level under this guideline." *Id.* As the comment illustrates, there is a tension – if not an outright contradiction – between, on the one hand, acknowledging the importance of multiple relevant factors and, on the other hand, insisting that loss amount should be a "principal factor" in determining sentence. *Id.*

Speaking to this problem, the Second Circuit has observed that there may be a "wide variety of culpability" among defendants with the same loss amount. *United States v. Cavera*, 550 F.3d 180, 192 (2d Cir. 2008)(en banc). Indeed, a crime involving little or no loss is sometimes much more serious than one involving a very large loss. Thus, "[a] fraud that results in the loss of even a few thousand dollars by an elderly or sick person who, as a result of the loss, becomes unable to afford the necessities of life or medical care is much more serious than a fraud that results in ten or a hundred times that loss by a large corporation able to absorb the

financial consequences without a need to close plants, fire employees, or even declare the loss as material in public financial reports.ö  *Corsey*, 723 F.3d at 381(Underhill, D.J., concurring). Depending on the nature and circumstances of the offense, loss may be a relatively useless factor in determining the severity of the crime and, accordingly, the appropriate sentence.  As Judge Lynch noted in *United States v. Mohammed*, 315 F. Supp. 2d 354, 357 (S.D.N.Y. 2003), öacross a wide range of diverse types of schemes and thefts, the amount of the loss . . . may be a less accurate proxy for the seriousness of the offense.ö  Common sense dictates that an armed robber with a long history of engaging in violent crimes and a life-long fraudster who makes a career preying on the vulnerable will likely deserve the imposition of relatively long sentence, in comparison to the defendant who, having never engaged in any prior wrongdoing, deceives a relative handful of sophisticated financial institutions in a manner that, while serious, causes none of them to suffer a material loss.  It therefore should be uncontroversial that, irrespective of the amount of loss, ö[a] defendant who consciously sets out to steal or cause economic loss is more culpable and deserving of punishment than one who acts dishonestly but without the desire to steal or cause loss.ö  Frank O. Bowman, III, *Sentencing High–Loss Corporate Insider Frauds After Booker*, 20 Fed. Sent¢g Rep. 167, 171 (2008).

The concept of relative culpability, and the importance of evaluating the blameworthiness of a given defendant compared to others in financial fraud cases, is critically absent from the offense level calculation under U.S.S.G. § 2B1.1.  Noting that ö[o]ne of the primary limitations of the [G]uidelines, particularly in white-collar cases, is their mechanical correlation between loss and offense level,ö the court in *United States v. Ranum*, 353 F. Supp. 2d 984,  990 (E.D. Wis. 2005) observed:  ö[w]ere less emphasis placed on the overly-rigid loss table, the identification of different types of fraud or theft offenses of greater or lesser moral culpability

or danger to society would perhaps assume greater significance in assessing the seriousness of different frauds."  (Imposing a non-guideline sentence for a defendant convicted of misapplication of bank funds).[4]

### C.   The Fraud Guidelines Effectively Make Loss Amount the Only Relevant Factor in Sentencing

The excessively high loss enhancements under U.S.S.G. § 2B1.1(b)(1) irrationally elevates loss amount to, in essence, the *only* relevant factor in calculating the Guidelines sentence in certain categories of cases.  This result undermines the express requirements of section 3553(a).  *See, e.g., United States v. Gupta*, 904 F. Supp. 2d 349 (S.D.N.Y. 2012) *aff'd,* 747 F.3d 111 (2d Cir. 2014)(Rakoff, J.) ("By making a Guidelines sentence turn, for all practical purposes, on this single factor, the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, *see* 18 U.S.C. § 3553(a), and, by contrast, effectively guaranteed that many such sentences would be irrational on their face.").

For these reasons, "[t]here is broad consensus among scholars that basing the fraud guidelines on the amount of loss ·often results in widely unwarranted sentencing disparity and a lack of certainty in sentencing, and produces sentences grossly disproportional to the actual seriousness of the offense."  *United States v. Spencer*, 700 F.3d 317, 327 (8th Cir. 2012) (J. Bright, dissenting) (noting that the Guidelines provide a questionable starting point for

---

[4]      In September 2013, the American Bar Association Task Force on the Reform of Federal Sentencing for Economic Crimes (the "Task Force") presented a working draft of a proposed guideline for the sentencing of federal economic crimes.  The proposed guideline shifts the focus away from loss amount, imposing a maximum increase of 14 levels based on loss amount, instead emphasizing the defendant's culpability and victim impact as critical factors in calculating the offense level.  The draft's application notes provide that the definition of loss should be incorporated from the current 2B1.1, with the important change that loss is defined as "actual loss."  A REPORT ON BEHALF OF THE AMERICAN BAR ASSOCIATION TASK FORCE ON THE REFORM FOR ECONOMIC CRIMES (2013), *available at* http://www.ussc.gov/research-and-publications/research-projects-and-surveys/economic-crimes/united-states-sentencing-commissionsymposium-economic-crime).

sentencing judges in high-loss fraud cases (citing Alan Ellis, John R. Steer, Mark H. Allenbaugh,

*At A "Loss" for Justice Federal Sentencing for Economic Offenses*, Crim. Just., Winter 2011, at

34, 35)); *see also Corsey*, 723 F.3d at 378(Underhill, D.J., concurring) ("The widespread

perception that the loss guideline is broken leaves district judges without meaningful guidance in

high-loss cases; that void can only be filled through the common law, which requires that we

reach the substantive reasonableness of these sentences."); Bowman, *Sentencing High–Loss*

*Corporate Insider Frauds After Booker*, 20 Fed. Sent'g Rep. at 169 ("[S]ince *Booker*, virtually

every judge faced with a top-level corporate defendant in a very large fraud has concluded that

sentences called for by the Guidelines were too high.").[5]

**D.    Numerous Courts have Imposed Below-Guidelines Sentences**
**in Cases Where the Guidelines Loss Amount Calculation**
**Overstates the Seriousness of the Offense**

Both before and after the Supreme Court determined that the Guidelines are

advisory in *United States v. Booker*, 543 U.S. 220 (2005), courts have declined to impose

Guidelines sentences in cases where such sentences overstate the seriousness of the offense.  For

example, in the recent case of *United States v. Viloski*, 557 F. App'x 28, 36 (2d Cir. 2014), in

which the defendant was charged with, among other offenses, wire fraud, mail fraud and money

laundering, the Second Circuit upheld the district court's determination that "the loss used to

establish the total offense level overstates the actual harm caused" and held that it had "properly

---

[5]    The author of a recent academic study examining judges' views regarding the relative
importance of loss amount as measured under the current Guidelines concluded that "[t]here can
be no doubt . . . judges are more likely to disagree with Guideline recommendations in fraud
cases that are driven substantially by loss." Allenbaugh, *"Drawn from Nowhere": A Review of*
*the U.S. Sentencing Commission's White-Collar Sentencing Guidelines and Loss Data*, 26
Federal Sentencing Reporter 19, 26 (2013).  Based on statistics released by the Sentencing
Commission for the period October 1, 2012 through September 30, 2013, Allenbaugh concluded
that "loss is an unsound measure of the seriousness of many offenses, with the result that judges
are increasingly willing to go below the Guidelines when they impose sentences in white-collar
cases." *Id*.

considered the § 3553(a) factors" in imposing a "substantially below-Guidelines sentence, partially on the basis that the loss amount was greater than the actual harm caused").  Similarly, in *United States v. Corsey*, 723 F.3d 366, 377 (2d Cir. 2013), the Court of Appeals remanded the case for a determination of whether the loss amount calculation was appropriate, in light of defense counsel's argument that "a 30-point mega-enhancement vastly overstated both the seriousness of the offense and the danger of appellants to the community" as well as the "low risk that any actual loss would result").  In *United States v. Williams*, the Second Circuit affirmed a below-Guidelines sentence in a case involving false statements on the defendant's tax returns, in which "the District Court determined that the Guidelines range . . . was too severe because the intended ‑loss amounts,' which were based on the very high numbers in [the defendant's] tax filings, ‑substantially overstate[d]' the seriousness of his offense."  In *United States v. Levenson*, 314 F. App'x 347, 349 (2d Cir. 2008), the Second Circuit affirmed the district court's imposition of a non-Guidelines sentence in a financial fraud case where the "loss amount of 40 million ‑overstate[d] the seriousness of [the defendant's] role in the offense."

       Even under the pre-*Booker* sentencing regime, the Second Circuit affirmed downward departures in cases where the Guidelines loss amount calculation overstated the defendant's culpability.  *See, e.g., United States v. Speight*, 75 F. App'x 802, 806 (2d Cir. 2003) (affirming sentence in a mail fraud case where "[a]fter noting the multibillion-dollar amounts of Speight's demands and liens," the district court sentenced the defendant to "less than half of his Guideline range" noting that "the intended loss dramatically overstates the seriousness of the offense") (internal quotation marks omitted); *United States v. Mohan*, 62 F. App'x 372, 373 (2d Cir. 2003) (in a bank fraud case, affirming three-level downward departure "on the ground that the intended loss amount set forth in the PSR ($150 million) overstated [the defendant's]

culpabilityö); *United States v. Restrepo*, 936 F.2d 661, 667 (2d Cir. 1991) (finding, in a money laundering case, that a four-level downward departure was warranted õwhere, as here, an offense level has been extraordinarily magnified by a circumstance that bears little relation to the defendant's role in the offense . . . . With respect to [defendants], the adjustment for the amount of cash involved in the money laundering charge was an increase of nine levels.  The effect was dramatic.  This single factor raised the total offense level, after calculating all other adjustments, from 20 (with a range of 33-41 months) to 29 (with a range of 87-108 months).ö).[6]

The rejection of irrationally excessive Guidelines sentences based on the mechanical application of the loss amount calculation under § 2B1.1(b) is common among sentencing judges in this district and elsewhere.  For example, in *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) *aff'd*, 747 F.3d 111 (2d Cir. 2014), in which the Guidelines sentence dictated a sentence of 97-121 monthsø imprisonment, Judge Rakoff imposed a sentence of 24 months, and in the course of his decision, as discussed above, thoroughly repudiated õthe huge increase in the recommended Guidelines sentences for securities fraud casesö on the ground that they õreflect an ever more draconian approach to white collar crime, unsupported by any empirical data.ö

Similarly, in *United States v. Balboa*, Judge Crotty imposed a sentence of 48 months, rather than the Guidelines term of life or the PSRøs recommended sentence of 144 months, finding that the Guidelines õvastly overstate[d] the seriousness of the offense.ö  No. 12-

---

[6]    The Second Circuit was not unique in affirming such downward departures before *Booker.  See, e.g.*, *United States v. Rostoff*, 53 F.3d 398, 408-09 (1st Cir. 1995)(affirming the district courtøs downward departure where the district court determined that the loss amount õgrossly overstated the seriousness of the defendantsø criminal activity and noting: õPrecisely because the guidelines use amount of loss as a proxy for culpability in fraud cases, a supportable finding that the loss exaggerates the reality of events often is tantamount to a finding that the conventional sentencing range exaggerates a defendantøs blameworthiness, and, thus, tends to invite a corresponding downward departure.  So it is here.ö).

cr-00196, Sentencing Tr. at 79-80, ECF No. 165 (June 23, 2014). Balboa was convicted for fraudulently inducing investors to invest in his hedge fund by falsely representing to investors that all assets held by the fund would be independently valued; in reality, Balboa falsely overvalued certain securities. *Id.*, Tr. at 77-78. Judge Crotty found the loss amount to be $390 million, which was the amount Balboa received from investors on fraudulent promises, resulting in a 28-point loss enhancement and a total offense level of 49. *Id.*, Tr. at 78-79. In concluding that the Guidelines vastly overstated the offense, Judge Crotty stated that Balboa's case showed "all the difficulties of just making a number a dominant factor and saying it excludes all the other factors– two offense level, three offense level, and all of a sudden 28." *Id.*, Tr. at 68. The court also noted that Probation's recommended 144-month sentence was "what you get for murder in connection with a drug conspiracy." *Id.*, Tr. at 68.

Judge Crotty also imposed a non-Guidelines sentence in *United States v. Kelly*, 12-cr-00888 (PAC), in which the defendant pleaded guilty to making misrepresentations to investors in the securities of a start-up technology firm and diverting over $2 million in investor funds into his personal, offshore brokerage account. Judge Crotty rejected the government's Guidelines calculation of 63-78 months' imprisonment, instead imposing a sentence of 27 months, which he calculated using the Guidelines manual in effect in 1987. *See* Judgment, 12-cr-00196, ECF No. 30 (Sept. 23, 2014). Similarly, in *United States v. Parris*, 573 F. Supp. 2d 744, 750-51 (E.D.N.Y. 2008), a securities fraud case, the court imposed a sentence of 60 months, finding the guideline range of 360 months to life "draconian" and stating that the Guidelines did "not provide realistic guidance." The court explained that Parris's case represented "another

example where the guidelines in a securities-fraud prosecution "have so run amok that they are patently absurd on their face," due to the "kind of "piling on" of points for which the guidelines have frequently been criticized."" *Id.* at 745 (quoting *Adelson*, 441 F. Supp. 2d at 515, 510).

## III. A SUBSTANTIALLY BELOW-GUIDELINES SENTENCE WITH STRICT CONDITIONS OF SUPERVISED RELEASE IS APPROPRIATE IN THIS CASE

A substantially below-Guidelines sentence with the condition of mandatory community service is warranted in this case, in light of the history and circumstances of Mr. Walsh, the nature and circumstances of his offense, and the need to promote respect for the law, provide just punishment, and ensure the goals of general and specific deterrence.

### A. Nature and Circumstances of the Offense

A substantially below-Guidelines sentence is appropriate in this case, in light of the nature and circumstances of the offense. First, Mr. Walsh's wrongdoing, though undeniably serious, was not part of a scheme to defraud investors in the WG entities *ex ante*. Mr. Walsh has admitted to and accepted responsibility for deceiving investors of the WG entities. Specifically, Mr. Walsh acknowledged that he signed promissory notes, which falsely stated he owed and would timely repay tens of millions of dollars to WGTI. He signed these notes, even though he knew that WGTC's books would be misstated as a result. *See* Plea Tr. at 16-17. Yet, WGTC and WGTI were not conceived in fraud. To the contrary, the WG entities were initially conceived and operated as legitimate businesses. Moreover, the WG entities at all times invested in real assets — including the sound and often profitable index arbitrage trading strategy — with the objective of earning profits and the intention to return investors' funds with a positive return.

Second, this case did not involve a "Ponzi scheme." According to the Second Circuit, a Ponzi scheme is "one in which earlier investors' returns are generated by the influx of fresh capital from unwitting newcomers rather than through legitimate investment activity."

*S.E.C. v. Credit Bancorp, Ltd.*, 290 F.3d 80, 89 (2d Cir. 2002) (internal quotation marks omitted). A Ponzi scheme is "by definition, at all times insolvent." *In re Bernard L. Madoff Inv. Sec. LLC*, 458 B.R. 87, 110 n.15 (Bankr. S.D.N.Y. 2011); *see also Armstrong v. Collins*, No. 01-cv-02437 (PAC), 2010 WL 1141158, at *21 (S.D.N.Y. Mar. 24, 2010) (same) (citing *Cunningham v. Brown*, 265 U.S. 1, 7-8 (1924) ("Charles Ponzi . . . was always insolvent, and became daily more so, the more his business succeeded.  He made no investments of any kind, so that all the money he had at any time was solely the result of loans by his dupes.")); *In re Bennett Funding Grp., Inc.*, 253 B.R. 316, 323 (Bankr. N.D.N.Y. 2000) ("the eponymous architect of the 'Ponzi' scheme never engaged in a regular business that had economic substance or profit potential and was insolvent from the beginning") (internal quotations omitted).

Mr. Walsh's culpable conduct, which consisted principally of misrepresentations concerning the WG entities' finances, is manifestly distinguishable from the wrongdoing of a "Ponzi scheme" defendant.  Such a defendant never invests in legitimate assets, as the WG entities did, and always intends to steal, which Mr. Walsh did not.  Unlike a "Ponzi scheme," the WG entities were not insolvent from inception.  They were founded in the early 1990s as legitimate businesses, organized around a demonstrated and often profitable investment strategy.  To the extent the WG entities made investments that were not consistent with the index arbitrage strategy, those too were real and intended to turn a profit.  Because Mr. Walsh was not engaged in a "Ponzi scheme," as that term has been defined by the courts, it would be neither "reasonable" nor consistent with the "individualized assessment" required under *Gall* to sentence Mr. Walsh to the same sentence as a true "Ponzi scheme" defendant.  *See, e.g., United States v. Ovid*, No. 09-cr-00216 (JG), 2010 WL 3940724, at *3 (E.D.N.Y. Oct. 1, 2010) (imposing a below-guideline sentence in part because the defendant's hedge fund "was not . . . started as a fraud");

*see also United States v. Schneider*, 930 F.2d 555 (7th Cir. 1991) (distinguishing between "outright theft, an act complete when the good is taken" and the defendant "contractor who intends to perform a valuable service, but fraudulently obtains the right to perform").

Third, this case presents the extraordinary situation in which approximately 99 percent of the invested principal has been or will be returned to investors. Based on the Receiver's reports and the information available to the parties, it is likely that the total value of the recovery to investors will be $949.5 million, which will result in the return to investors of approximately 99 percent of their invested principal. The majority of these assets were recovered by liquidating WGTC's portfolio shortly after the fraud was discovered. Specifically the receiver recovered approximately $812 million from the liquidation of WGTC's hedged portfolio in May 2009 and a total of approximately $883 million has been recovered from the liquidation of WGTC/WGTI accounts and assets. Thus, over 90 percent of invested principal was invested by the WG entities in valuable assets. As noted, the Receiver himself commented on the extraordinary character of this result.

The return of approximately 99 percent of the invested principal – in addition to demonstrating the dramatic difference between this case and a "Ponzi" scheme – takes this case well outside the heartland of securities fraud prosecutions and illustrates the inappropriateness, in this case, of the Guidelines loss calculation method. There is obviously a conceptual problem with a "loss amount" formula that equates the amount of money that was available to be returned to investors because it was invested in real assets with the "loss amount" for the purposes of imposing a 30-point enhancement to the defendant's offense level.[7] Although the Guidelines

---

[7]     *See, e.g., United States v. Allmendinger*, in which the district court determined the loss amount to be $93,920,635.46, which the appellate court noted "reflected the total amount lost by

count every dollar towards the calculation of loss, there is no rational justification for imposing a twenty year sentence on Mr. Walsh when, in fact, the majority of invested funds were not only returned, but invested, as promised, in a low-risk portfolio.  Rather than ratchet up the offense level, the fact that nearly every penny of invested principal was recoverable and returned to investors should weigh heavily in favor of leniency.

Fourth, the losses in this case were suffered only by large, sophisticated institutional investors.  None of the victims in this case is an individual investor.  Moreover, the institutions that invested in the WG entities had committed only a small fraction of their respective funds under management, and so were not put at risk as the result of the Defendants' wrongdoing.  Thus, no personal savings or retirement accounts were put in jeopardy, as often happens in true Ponzi schemes.  Nor did Mr. Walsh's misconduct jeopardize the livelihood of company employees or erode the value of widely-held shares, as is characteristic in securities frauds perpetrated by the management of public companies.

The fact that the investors in the WG entities were institutions rather than individuals does not, of course, excuse the fact that Mr. Walsh committed securities fraud.  Nevertheless, sentencing under 18 U.S.C. § 3553(a) and in accordance with the precepts of *Gall* requires an "individualized assessment" that, in turn, necessitates an examination of the defendant's relative culpability.  Such an analysis must take into account, as Judge Underhill reasoned in *Corsey*, that:

> not all actual loss is equally serious.  A fraud that results in the loss of even a few thousand dollars by an elderly or sick person who, as a result of the loss, becomes unable to afford the necessities of life or medical care is much more serious than a fraud that results in ten or a hundred times that loss by a large corporation able to

---

the 825 investors during the entire scheme less the amount that had been recovered in the related A & O bankruptcy as of the date of the sentencing."  706 F.3d 330, 337 (4th Cir. 2013).

absorb the financial consequences. . . . [s]imply put, contrary to the assumption
underlying the loss guideline, not all dollars of loss are fungible.

723 F.3d at 381 (2d Cir. 2013).

Applying the principle that not all losses are equal for purposes of determining an
appropriate sentence under 18 U.S.C. § 3553(a), courts routinely distinguish between conduct
that impacts principally financial institutions, on the one hand, and frauds that victimize
vulnerable individual investors, on the other.  While by no means minimizing the culpability of
defendants in the former type of case, sentencing courts have noted the comparatively reduced
harm that results to institutions.  *See, e.g., United States v. Harris*, 689 F. Supp. 2d 692, 695
(S.D.N.Y. 2010) ("the victims of [the defendant's] fraud were a consortium of sophisticated
international banks, advised by accountants and attorneys, whose existence and business
activities survived the fraud.  This does not excuse [the defendant's] crimes against them, but the
plight of the victims in this case cannot be mistaken for the devastated individual victims of
schemers such as Bernard Madoff."); *United States v. Rostoff*, 53 F.3d 398, 407 n8 (1st Cir. 1995)
(affirming the district court's calculation of the loss amount for sentencing purposes lower than
the amount proposed by the government, and noting that "many of the purchasers were
sophisticated investors . . . who surely should know . . . [that] projected profits that look too good
to be true often are – and often signify the presence of great financial hazards.").  By contrast,
sentencing courts have imposed longer sentences in cases involving severe economic harm to
individuals, particularly where the defendants preyed on vulnerable, unsophisticated investors.
*See, e.g., United States v. Turk*, 626 F.3d 743, 747 (2d Cir. 2010) (affirming sentence of sixty
months' imprisonment in a mortgage fraud case where "a number of victims spoke at the
sentencing hearing, explaining how [the defendant's] fraud had devastated their lives, some
describing how their losses had left them without retirement savings or the ability to pay for

health care or their children's educationö); *United States v. Marsh*, No. 10-cr-0480, 2011 WL

5325410, at *8-10 (E.D.N.Y. Oct. 26, 2011) (imposing sentences ranging from three months to

ninety-six monthsø incarceration where defendantsø fraud õseverely and adversely impacted the

lives of thousands of people, in that it wiped out or seriously depleted their retirement accountsö

and caused õphysical and emotional strainsö and the õdefendants clearly took advantage of the

unique vulnerability of their victimsö).

        Finally, Mr. Walshøs role in the offense was less than that of his co-defendant, Mr.

Greenwood.  As discussed above, Mr. Walsh began to disengage from the management and

operations of WGTC and WGTI in the early 1990s.  It is undisputed that, during the majority of

the period covered in the Indictment, Mr. Walsh had no involvement in preparing presentations

to investors or soliciting investments.  Indeed, Mr. Walshøs role in the business became so

attenuated that Mr. Carder, who was a 49 percent owner of Westridge Capital Management,

complained about the fact that Mr. Walsh continued to receive a partnerøs share of the profits,

even though he did no work.  *See* June 28 Tr. at 14:3-15, 21:2-5.  It is also undisputed that

Mr. Walsh worked from an office located in a different state from the office where

Mr. Greenwood and the CFO, Deborah Duffy, ran WGTI and WGTC.  *See* May 25 Tr. at 291:4-

16.  Mr. Greenwood, Ms. Duffy, and Tim Barba kept the WG entitiesø books and bank accounts

and prepared the false account statements that were distributed to investors, *see id*. at 187:2-

188:18, 354:4-357:12; *see also* June 28 Tr. at 3:8-19; Mr. Walsh had no involvement in these

aspects of the fraud.  *See* May 25 Tr. at 270:22-25.  Although Mr. Walsh and Mr. Greenwood are

similarly situated in many respects, Mr. Greenwood masterminded the fraud and, importantly,

came up with the idea of the fraudulent notes payable, which he and Ms. Duffy prepared and sent

to Mr. Walsh for his signature.  *See* May 24 Tr. at 149:18-150:5.  Indeed, Mr. Greenwoodøs

primary role and greater knowledge of the fraud put him in a position to recount the scheme in detail to the Government and cooperate against Mr. Walsh.  In contrast, Mr. Walsh's efforts to assist the Government were rebuffed because of Mr. Walsh's relative lack of knowledge of the details of the fraud.  Accordingly, Mr. Walsh's sentence should reflect the fact that he was not the lead actor in the securities fraud conspiracy at issue in this case.  *See, e.g.*, *United States v. Babar*, 512 F. App'x 78, 81 (2d Cir. 2013) (affirming disparate sentences for unequally culpable co-conspirators, in a case involving wire fraud, mail fraud, false statements, and conspiracy, "because the district court found sufficient facts to determine that [the defendant] was the leader of the conspiracy, we see no error in its decision to impose a longer sentence on [the leader of the conspiracy] than on his less culpable co-conspirators"); *see also United States v. Esso*, 486 F. App'x 200, 203 (2d Cir. 2012) *cert. denied,* 133 S. Ct. 562, 184 L. Ed. 2d 365 (U.S. 2012)(remanding a mortgage fraud case for re-sentencing where the district court "failed to explain why [the defendant] received a longer sentence than [his co-defendant] despite [the defendant's] lesser culpability, and the fact that the two were similarly situated in numerous respects").

### B.    History and Circumstances of Mr. Walsh

Mr. Walsh's history and personal characteristics also argue strongly in favor of a substantially below-Guidelines sentence.  We respectfully submit that, as described above and in the more than sixty letters presented to the Court, Mr. Walsh is very different from most defendants who appear before this Court for sentencing.  His dedication to his family, his professional accomplishments and, above all, his lifelong commitment to helping others, both individual human beings and the larger community, are expressions of who Mr. Walsh truly is – indeed, who he has always been, from childhood through professional maturity and success, and

even after his arrest and indictment of federal criminal charges and now, in his retirement years. In this sense, Mr. Walsh's conviction in this case represents an aberrational departure from his overwhelmingly positive personal history.

### 1.    Dedication to Family

As discussed above and in many of the letters submitted to the Court, Mr. Walsh has always been a devoted father to his three children – a constant and always supportive presence in their lives, beginning when they were infants, during childhood and adolescence. Mr. Walsh coached their sports teams during middle school, high school and college, supported their academic ambitions and continues to guide them as they make life and career choices as adults.

Mr. Walsh's devotion to his family is noted in several of the letters.  For example, Kenneth Gaynor, a close friend of Mr. Walsh for over fifty years, describes how "Steve has been a wonderful father to three great kids." Ex. 54 (Letter of Kenneth Gaynor).  He "seldom missed an event for any of them." *Id.*  According to Mr. Gaynor, "[h]is parenting skills have been proven successful as all of them have both great careers and have strong and honest work ethics." These observations are echoed by another close friend, Barry Cohen, who notes that "Mr. Walsh has been there for his children through the good times and the bad, helping them to achieve their dreams and face the disappointments of life." Ex. 2 (Letter of Barry Cohen).  Mr. Cohen has "seen, firsthand, decisions made by Mr. Walsh, regarding health problems, school issues, and professional challenges of his family" and how "[h]e always addressed the situations directly,

33

with love." *Id.*  He describes Mr. Walsh's children as "his highest priority" and observes that

"Mr. Walsh's continued commitment to his children has created a sense of loyalty and trust

between them and has provided them a source of strength despite this most difficult period in his

life." *Id.*

   Maureen O'Rourke Murphy, the sister of a lifelong friend, knows him to be "a

concerned and loving father." Ex. 47 (Letter of Maureen O'Rourke Murphy).  When

Mr. Walsh's first wife (and the mother of his older son) died, Ms. Murphy was the Dean of

Students at Hofstra.  *See id.*  She observed that Mr. Walsh was "concerned with the impact of the

loss on Michael." *Id.*  He visited Ms. Murphy and they "worked together with Michael's

academic college counselor to see him through his loss and to complete his degree." *Id.*  "Steve

took great pride in his daughter's college career as a scholar athlete at Johns Hopkins and her

subsequent career in the financial industry." *Id.*  Ms. Murphy describes how "Steve has mentored

his younger son Andrew and helped establish him in the business of commercial real estate." *Id.*

   John Kenyon, the most recent addition to Mr. Walsh's extended family, describes

his father-in-law as "the proud head of this very close, loving family." Ex. 44.  He gives

Mr. Walsh "credit for the wonderful children and grandchildren he has raised and the unity

within that family." *Id.*  He notes that "Steve is very much an emotional support to everyone in

his family and his loyalty and family orientation could never be questioned.  It would be both

heartbreaking and destructive to Steve's children and grandchildren if he is incarcerated." *Id.*

Mr. Kenyon fondly recalls how, when they first met at a Thanksgiving dinner, Mr. Walsh

"recounted intricate details from basketball, hockey & lacrosse games along with funny stories

from their childhood, told with such warmth and affection, [which] showed what a great Dad he

really was and why his children have such great character themselves." *Id.* "Steve was literally telling me the statistics of Sarah's high school basketball games (at that time more than 10yrs earlier) - Steve's children and grandchildren are Steve's life." *Id.*

Mr. Walsh's unwavering dedication to and love for his children is amply documented in the letters submitted on his behalf, which are replete with examples of how Mr. Walsh has touched the lives of his own children, their friends, and their children.

Juliana De Los Santos, who worked in Mr. Walsh's home when his children were young, describes how Mr. Walsh has stayed in touch with her, long after she stopped working for his family, and "has always been concerned for [her] well-being." Ex. 29 (Letter of Juliana De Los Santos). In her long experience of him, she observed Mr. Walsh's pride in helping others and how he "always took time to talk to [her] children and advised them about being good citizens and productive individuals." *Id.*

Keith Levinson, a childhood friend, describes how much it meant to him, as someone who had grown up with an absent father, that Mr. Walsh took him in and treated him as his own son. *See* Ex. 30 (Letter of Keith Levinson). He credits Mr. Walsh for his success and for making him into the man he is now. *See id.*

Kimberly Greene, a longtime friend of Mr. Walsh's daughter Sarah, describes how Mr. Walsh "always made me feel like I mattered and that I was special." Ex. 31 (Letter of Kimberly Greene). Recently, when her grandmother passed away, Mr. Walsh attended the funeral, even though he was on crutches and recovering from foot surgery. She was "touched and appreciative of his show of support [for her and her family] especially in light of the type of stress he was under." *Id.* In her view, "that is the type of behavior that exemplifies Stephen Walsh." *Id.*

Margot Moskowitz, a close family friend who has known Mr. Walsh her entire life, recalled spending many nights each week with the Walsh family in 2010, after she graduated from college.  On those occasions, Mr. Walsh "showed genuine interest in the happenings of my career and plans for my future." Ex. 32 (Letter of Margot Moskowitz).  According to Ms. Moskowitz, "[k]nowing that someone cares about your wellbeing is a special thing" and that "Steve truly cares." *Id.*

Noting that "Stephen has always been there for his family and friends," Mr. Walsh's brother-in-law, Gary Monahan, writes:

> I have witnessed how much love and dedication he has shown to his parents and sisters. When my wife was diagnosed with Multiple Sclerosis, Stephen was the first one to step up and make sure that she got the best medical care.  He always reached out whenever a family member needed his help and guidance.  At one time, his nephew Adam needed a place to live and Stephen took him in to live with his family.  He did this unselfishly and wanted to help this young boy during a difficult time in his life and treated him like his very own son.

Ex. 6.

## 2.    Efforts on Behalf of Community and Charitable Organizations

As noted, Mr. Walsh has devoted substantial time and effort to supporting and raising money for a diverse range of charitable causes.  He has held leadership positions at various charitable and community organizations in the fields of education, community health care and athletics.  Mr. Walsh played an integral role in founding the Long Island Alzheimer's Foundation.  In addition, since joining AA, Mr. Walsh has participated in AA programs to assist inmates at Riker's Island who are struggling with alcohol addiction.  To the extent permitted by the Bureau of Prisons, Mr. Walsh intends to continue this commitment throughout any term of incarceration by volunteering to counsel fellow inmates with substance abuse problems.  Many of the letters describe Mr. Walsh's long-standing commitment to such charitable work.

George Hambrecht notes that "Steve's contribution is singular in effect because it not only made a huge difference for the victims of Alzheimer's but also for their extended family and caregivers." Ex. 17 (Letter of George Hambrecht).  Mr. Hambrecht describes how Mr. Walsh and Ms. Schaberg helped him to find a support group close to his parents' home, which took care of Mr. Hambrecht's mother, who is suffering from Alzheimer's.  *See id*.  He explains how this not only improved his mother's quality of life, but also helped his elderly father, whose health was declining because of the stress of caring for his ailing wife.  *See id*.

The letters attest to Mr. Walsh's extensive efforts to support LIAF.  Ralph Nappi, a health care executive, observed that LIAF "would have foundered without [Mr. Walsh's] support and active participation." Ex. 26 (Letter of Ralph Nappi).  Linda Cronin, a past president of LIAF, explains how Mr. Walsh did not limit his involvement to contributing money.  Rather, he was "in the trenches," supporting LIAF in many different ways, from organizing charitable fund-raisers and sporting events, to providing office space, to visiting and spending time with Alzheimer's patients.  *See* Ex. 18.

Paul Salerno, a former LIAF treasurer, describes how "listening to Steve talk about the impact of Alzheimer's on [the] Long Island community as well as the lack of appropriate services available for patients," and seeing "the compassion he had for those afflicted with the disease and his true desire to make a difference in the community" motivated Mr. Salerno "to get involved and assist on the financial side of the Foundation" despite having no prior "connection with the disease." Ex. 19 (Letter of Paul Salerno).  Mr. Salerno also attests to "Steve's honesty [and] integrity as [they] related to [LIAF] financial matters." *Id*.  Mr. Salerno also describes how Mr. Walsh would "give selflessly of his time and talents" to the foundation. *Id*.

Thomas Killeen, a past chairman and current member of LIAF's board of trustees, explains how Mr. Walsh "was not above performing any task to help LIAF – cleaning, painting, opening the office on the weekends, etc." Ex. 20 (Letter of Thomas Killeen).  Michael O'Rourke recalls "watching Steve spend hours listening and speaking to family members, friends, and prospective donors for the single purpose of trying to do whatever he could to explore options for [Alzheimer's] treatment or to cushion the hard reality of these cruel diseases." Ex. 21 (Letter of Michael O'Rourke).

According to Maureen O'Rourke Murphy, "Steve . . . was the person that made LIAF happen: its programs for patients and for care-givers, its building for its day-care program and it's other activities and its administrative center and LAIF's generous support of research to improve the diagnosis and treatment of scientists search for a cure.  Without Steve, there would have been no LIAF." Ex. 47.

Richard Reinis, who has known Mr. Walsh for over a decade, recalls how "Steve knew that I have been a trustee of a large foundation and asked me about process, evaluation, entrepreneurial giving, and about being charitable with something more than money." Ex. 46 (Letter of Richard Reinis).  According to Mr. Reinis, Mr. Walsh's "motivations were to help those in need, pure and simple.  He wasn't interested in what his giving could buy him; just how he could make the most impact." *Id.*

In his letter, Robert Hughes details his personal experience of the "generosity and good will" that Mr. Walsh, his "trusted friend for almost six decades," demonstrated through his assistance and support of Mr. Hughes's efforts to prevent and raise awareness about child abuse and neglect.  Ex. 3 (Letter of Robert Hughes).

One common theme in the letters is that Mr. Walsh's efforts, on behalf of charitable organizations and the people he cares for, went far above the provision of financial assistance. As Elwood Collins put it: "It is one thing to write a check. It is quite another, as [Mr. Walsh and his ex-wife] did, to give of your time and effort and money completely and without reservation." Ex. 25 (Letter of Elwood Collins). This sentiment is repeated by Mr. Collins' wife, Janice Collins, who explains that, based on her experience as a probation officer for forty years, she "sincerely believes that the community would be much better served if Steve Walsh were to receive a sentence of probation rather than to do time in prison." Ex. 11 (Letter of Janice Collins). She describes how Mr. Walsh's compassion personally affected her. Following her temporary separation from Mr. Collins, Mr. Walsh and his then wife, recognizing the toll their separation was having on the couple's nine year-old son, "made a concerted effort to ease his adjustment to his new circumstances" and did the same for her, always including them in "holiday celebrations and family events." *Id.* When many of her friends forgot her, "the Walshes did not," providing her with "emotional support and a social outlet" and giving her "son a second home and treat[ing] him like their own." *Id.*

### 3.      Devoted Friend

In addition to his work on behalf of LIAF and other charitable organizations, Mr. Walsh is a devoted friend. In their letters, those who know him well attest to his attentiveness and concern, especially during their darkest hours.

Michael Zenobio describes Mr. Walsh as "a person that never hesitates to give of himself and share with those less fortunate." Ex. 22 (Letter of Michael Zenobio). He notes that, in addition to establishing LIAF, which "made a positive difference for so many," Mr. Walsh has

guided and assisted Mr. Zenobio's sister-in-law and her three children with their finances after the death of their husband and father – Mr. Zenobio's brother – from cancer.  *Id*.

Michael Gahan notes that, over the course of their twenty year friendship, Mr. Walsh "has always impressed [him] with how much time he devotes to others in need." Ex. 23 (Letter of Michael Gahan).  Mr. Gahan details the tremendous support Mr. Walsh provided to Mr. Gahan's father, who was suffering from cancer at the time, when Mr. Gahan's mother was also diagnosed with cancer:  "[a]ll through the inns and outs of the hospital with [his] mom was Stephen, stopping by the hospital, calling [his] dad, taking him out, keeping him busy during [the] difficult time." *Id*.  He notes how Mr. Walsh "never left [their] side through all the pain." *Id*.

Mary DeNisco believes that "[g]enerosity is a word synonymous with Stephen Walsh" and notes that Mr. Walsh "was right there for [her] family" when her husband died of cancer in 2004.  Ex. 24 (Letter of Mary DeNisco).  Ten years later, Mr. Walsh "is still a concerned, caring friend." *Id*.

Barry Cohen, Mr. Walsh's close friend for over fifty years, explains that "[w]hen I think of ÷character, the following traits come to mind: kindness, honesty, dependability, openness, generosity, humbleness, and morality." Ex. 2.  "Mr. Walsh indeed has character, possessing all of these traits." *Id*.  He explains that Mr. Walsh has "a strong sense of right and wrong" and is "a man who makes every effort to take the higher road." *Id*.  He has "never seen Mr. Walsh deliberately hurt anyone." *Id*.  He acknowledges that his "description of Mr. Walsh might seem over the top, perhaps exaggerated.  But, that is the way I see him and the way I have seen him behave over the 52 years of our friendship." *Id*.

Dennis Cronin, another close friend of Mr. Walsh, describes him as "one of the finest men I know." Ex. 7 (Letter of Dennis Cronin). He knows Mr. Walsh as "a humble man of humble origins who, notwithstanding many successes in his life, has never forgotten where he came from and why it is important to help others find a better place in life." *Id.*

Michael Balboni, the former Deputy Secretary for Public Safety for the State of New York, has "been asked numerous time[s] to supply letters for consideration by a judicial official for leniency prior to sentencing." Ex. 9 (Letter of Michael Balboni). He "previously resisted all requests." *Id.* Yet, he was eager to write on Mr. Walsh's behalf to attest to "the traits and character that he has demonstrated to me during our friendship." *Id.* Their friendship began when Mr. Balboni "first met Steve though his wife, Janet and their work on the Alzheimer's Foundation." *Id.* "It was through these interactions that I saw firsthand the caring and compassion that Steve had for those suffering from the disease." *Id.*

Michael Welch, another longtime friend, writes that during his thirty-three year career as a "professional educator retiring as Director of Secondary Education for the largest suburban school district in New York located in Brentwood on Long Island" he has held multiple positions that required him to exercise the "ability to assess abilities and quality of character." Ex. 4 (Letter of Michael Welch). During his "long association with Mr. Walsh, I became familiar with a person who became successful and respected as a result of intelligence, initiative and most important integrity." *Id.* Mr. Walsh's "philanthropy, both publicly acknowledged and quietly purveyed, should not go unnoticed in deciding the consequences of a serious lapse in judgment which he sincerely regrets." Mr. Welch requests that the Court "consider the whole person as you decide the outcome of this difficult matter." *Id.*

### 4.      Alcoholics Anonymous

As noted, Mr. Walsh has been a member of AA for approximately twenty months. He devotes a tremendous amount of time to supporting fellow AA members.  Those who know him in this context submitted moving testaments to Mr. Walsh's commitment to the work and goals of AA.

Richard Volpe, who knows Mr. Walsh through AA, recalls the support he received from Mr. Walsh when he suffered a serious back injury that required surgery:  "Stephen was there through my plight . . . and was always ready to help."  Ex. 27 (Letter of Richard Volpe).  Mr. Volpe explains how "it was Stephen's genuine care and concern that helped me cope with my pain and recovery."  *Id.*  Another AA member, Paul Higgins, explains how Mr. Walsh picked him up from the emergency room after he suffered a concussion.  *See* Ex. 28 (Letter of Paul Higgins).  He admires Mr. Walsh's "genuine kindness and willingness to be of service to others."  *Id.*

Of all the good causes Mr. Walsh has supported and people he has helped throughout the years it is his work with AA that has had the most profound effect on his life. George Malhame, another AA associate, describes Walsh's involvement with charitable causes as "an extension of the person [he] has come to know and love."  Ex. 34 (Letter of George Malhame).  He explains how Walsh "made and continues to make a difference in the lives of those in society who need it the most."  *Id.*  He notes that while "he no longer has the resources he once did, Steve continues to be involved in the charitable works of AA as well as those in the community at large. In addition to the hands on work he is involved with, he has used his extensive network to inspire others to do the same."  *Id.*

Mr. Malhame discusses the "significant commitment" he and Mr. Walsh have made to the AA Prison Ministry at Rikers Island (the "AA Ministry"). *See id.* Robert O'Connell, who has helped oversee the Ministry for the past twelve years, describes Walsh as one of a "small percentage of men" who volunteers to work with the Ministry. Ex. 35 (Letter of Robert O'Connell). In Mr. O'Connell's opinion, "[i]ncarcerating [Mr. Walsh] will benefit no one, especially those whose lives he has already impacted as well as the lives he will touch going forward." *Id.*

Those who know Mr. Walsh outside of AA have observed its profound impact on him. For example, Mr. Walsh's friend of nearly sixty years, Peter O'Rourke, writes:

> I am hardly qualified to comment on his criminal activity as it confounds my intuition. A life is a complicated skein and despite all our best efforts, it may begin to unravel. But does that render the whole unsound? Can a brilliant life lose all its shine? I hope not. Can a life, like a fine garment, be repaired? Can it be put back to good use? I think so. Steve has already begun the mending process. As he has always done, he has drawn people to him. His efforts with Alcoholics Anonymous are consistent with his ability to connect. In the process, he has not only begun to restore his own dignity, but he has used his current situation to help other members to better understand and forgive their own demons. I have known Steve for 58 years and I know he has been profoundly changed by his involvement with AA. He has shared with me personal insights about his life and his experiences. As the child of an alcoholic, he knows the issues first hand. What a better way than to spend his later years helping others cope with this terrible problem. I fully expect Steve to be a significant presence in the AA community, just as he has been a major presence in his business, philanthropic and social life. Incarceration, at this point in his life, might deny a number of souls the influence of his help and support. He is a resource to be used, not discarded. To say he has spent a good portion of his life and fortune helping others is not a stretch. Indeed, it might be the perfect time to help him find his way back to respectability and productivity."

Ex. 15 (Letter of Peter O'Rourke).

The most telling attestation to AA's positive impact on Mr. Walsh comes from his children.  Sarah Walsh writes:

> The humility and courage with which [my father] has handled the past five years of controversy is what I am most proud of.  Almost a year and half ago, my Dad went to his first Alcohol Anonymous meeting.  This past February, my family and I went to his One Year Anniversary meeting.  We were blown away by the experience.  I had numerous people come up to me and ask if I was Steve's daughter.  They said they had really wanted to meet me because my Dad has made such an impact on them and he's a very proud father.  One of the people described him as a bright light walking into the room.  He now chairs a couple of meetings a week and has a busy schedule as numerous members turn to him for advice.  I don't know that if he wasn't in this situation he would have found AA or built this community support network.  It is from him, I have learned to look for the silver linings, that it's never too late to change or make a difference.

Ex. 1.  Her brother, Michael, writes:

> Over the last year and a half I really have seen a change in my Dad.  He started going to Alcoholic Anonymous meetings and it has changed his life around.  He goes to 2 to 3 meetings a day, has made some amazing new friends and seems to have a new view on life.  He has mentored many young and old people over this time to help them beat this horrible disease.  He has also told me how amazing it has been to go and talk to inmates at Rikers Island.  I truly believe this has been one of the most life changing and amazing experiences in his 70 years.

Ex. 12.

**C.    A Substantially Below-Guidelines Sentence Including Mandatory Community Service Will Satisfy the Goals of Sentencing Under 18 U.S.C. § 3553(a)**

Sentencing judges, in fashioning an appropriate sentence that takes into account the history and characteristics of the defendant, are directed by 18 U.S.C. § 3553(a) to impose a sentence that is "sufficient but not greater than necessary" to, among other considerations, "reflect the seriousness of the offense, . . . promote respect for the law, and provide just punishment for the offense" and to "afford adequate deterrence to criminal conduct.  We submit

that, in light of Mr. Walsh's history and circumstances, discussed above, a substantially below-Guidelines sentence with conditions of home detention and community service is adequate to accomplish the goals of sentencing.

Mr. Walsh has led an overwhelmingly law-abiding life. As the many letters submitted to the Court demonstrate, he has a demonstrated, life-long commitment to supporting and caring for his family and friends. For the majority of his adult life, Mr. Walsh has embodied the values of education and hard work, marked by admirable professional accomplishment and entrepreneurial success. He has also made exemplary efforts on behalf of a range of charitable and community organizations, which include co-founding an organization dedicated to reducing the suffering of Alzheimer's patients, supporting fellow members of Alcoholics Anonymous and counseling inmates suffering from addiction. Where, as in this case, a defendant has devoted significant time to civic and charitable contributions, courts have found the defendant deserving of a non-Guidelines sentence substantially below the advisory Guidelines range. *See, e.g.,* *United States v. Holzer*, 09-cr-00470 (VM), Sentencing Tr. at 17, ECF Nos. 26 & 28 (Sept. 29, 2009) (imposing a sentence of five years' probation with nine months to be spent in a halfway house, noting that the defendant was a "good person who made a terrible mistake" and citing his "commendable community service and his pro bono work with various not-for-profit organizations" as reasons for imposing a below-Guidelines, non-custodial sentence); *United States v. Howe*, 543 F.3d 128, 132 (3d Cir. 2008) (affirming below-Guidelines sentence of probation with three months home confinement for wire fraud because the defendant had made an "isolated mistake" in the context of his entire life, which was otherwise marked by outstanding devotion to family, community and church); *United States v. Greene*, 249 F. Supp. 2d 262, 264 (S.D.N.Y. 2003) (finding that a seven level downward departure was warranted in a

pre-*Booker* tax fraud case because the defendant had donated his time, not merely money, in

adopting six "hard to place" orphaned children); *United States v. Canova*, 412 F.3d 331, 358-59

(2d Cir. 2005) (affirming downward departure in pre-*Booker* case based on defendant's

volunteer service with the Marine Corps and as a volunteer firefighter, as well as three recent

acts of good samaratanism); *United States v. Shuster*, 331 F.3d 294, 296 (2d Cir. 2003)

(affirming departure in pre-*Booker* case based on, among other factors, the defendant's charitable

works); *United States v. Serafini*, 233 F.3d 758, 773 (3d Cir. 2000) (downward departure upheld

in pre-*Booker* case based on support letters referring to defendant's "assistance, in time and

money, to individuals and local organizations"); *United States v. Crouse*, 145 F.3d 786, 790 (6th

Cir. 1998) ("exceptional" record of community service was a proper basis for a downward

departure); *United States v. Cooper*, 394 F.3d 172, 177 (3d Cir. 2005) (finding charitable

contributions relevant to sentencing where the contributions exceeded mere financial support).

## CONCLUSION

For the foregoing reasons, we submit that a substantially below-Guidelines sentence, with the condition of rigorous, full-time community service, will satisfy the goals of sentencing under 18 U.S.C. § 3553(a) and respectfully request that the Court impose a sentence of not more than 18-24 months ø incarceration.


Dated:  New York, New York
        October 15, 2014

                    SHER TREMONTE LLP


                    By:  /s/ Michael Tremonte
                        Michael Tremonte
                        Justin M. Sher
                        Valerie A. Gotlib
                        80 Broad Street, Suite 1301
                        New York, NY 10004
                        (212) 202-2600
                        mtremonte@shertremonte.com

                        *Attorneys for Defendant Stephen Walsh*